Filed 7/1/14

CERTIFIED FOR PUBLICATION

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| ANGELA NEVAREZ, Plaintiff and Respondent, v. CAMERON ROGER TONNA, Defendant and Appellant. | H039209 (Santa Clara County Super. Ct. No. DV016124) |

## I.  INTRODUCTION

Defendant Cameron Roger Tonna appeals after the trial court issued a two-year restraining order under the Domestic Violence Prevention Act (DVPA).  (See Fam. Code, § 6200 et seq.[1])  The restraining order contained personal conduct orders and stay away orders protecting plaintiff Angela Nevarez.  Tonna contends the trial court abused its discretion by issuing the restraining order because there was insufficient evidence he committed "abuse" (§§ 6203, 6300) and insufficient evidence that Nevarez feared future abuse.  We will affirm the trial court's order.

---

[1] All further statutory references are to the Family Code unless otherwise indicated.

## II. BACKGROUND[2]

Tonna and Nevarez were in a dating relationship for five years. They lived together from 2008 to 2010. On December 26, 2011, they "official[ly]" broke up. Following their breakup, Tonna continued to try to persuade Nevarez to get back together with him, and he came by Nevarez's workplace, a Safeway supermarket, almost every day.

### A. January 2012 to June 2012

Just after midnight on January 1, 2012, Tonna texted Nevarez, asking if Nevarez would see him that night. Nevarez replied, "I'm sorry but I really cannot see you right now." Tonna asked why and said he missed Nevarez, who responded, "I know but I cannot see you right now. I'm not comfortable with that I'm sorry." At 12:28 a.m. the next day, Tonna texted Nevarez, asking if she would talk with him. She declined. Later that day, Tonna again told Nevarez he wanted to "get together and talk things out." Nevarez said "Ok," and said she would let him know when. Tonna texted her at 2:20 a.m. the next morning, saying he was near her place. Nevarez did not respond until that afternoon, when she proposed that they meet that Friday if he needed to talk. Tonna continued to initiate communication with Nevarez over the next few days, sending her text messages saying he missed her, he loved her, and he wanted another chance.

On January 6, 2012, Tonna asked if Nevarez wanted to talk, and she replied, "No." When Tonna continued to text her, Nevarez reiterated several times that she was "done" with the relationship. Two days later, Tonna again asked if they could "meet up and talk." Nevarez told Tonna she was "not comfortable meeting with you if you are trying to have a relationship with me." Over the next few days and weeks, Tonna continued to ask Nevarez to call him or see him, and he continued to say he loved her and missed her. Nevarez continued to respond that she was "done" and did not want to see him. Nevarez

[2] Our factual summary is based on the evidence introduced at the restraining order hearing.

sometimes exchanged pleasantries and brief messages with Tonna. However, when Tonna sent text messages such as "wish I could be with u," Nevarez generally did not respond.

On January 16, 2012, Nevarez emailed Tonna, saying, "I'm overwhelmed with you calling me and messaging me. It is too much. And you coming by Safeway." She told Tonna that even though he said he was seeking counseling, "you and I are done, our relationship is done."

Over the next few months, Tonna continued to initiate communication with Nevarez, often in the middle of the night. He repeatedly told Nevarez he missed her, and he continued to try to make plans to get together with her. Nevarez often politely replied to Tonna's text messages, but she frequently declined to meet with Tonna or tried to put him off to a future date, and she told him she did not love him. Nevarez did agree that defendant could come over on her birthday, February 13, 2012, and she also agreed to meet with him on a few other occasions.[3]

On April 8, 2012, Tonna texted Nevarez, stating he was "nothing without [her]," that he had changed, that she should forgive him and "move forward with the relationship," that he loved her, and that he was willing to do whatever she wanted in order to have her back in his life. Nevarez told Tonna that she was still in his life and that he was her best friend. Nevarez said she was seeing a counselor. She suggested that Tonna also see a counselor, and she stated, "Otherwise I'm gonna involve your parents for help."

On April 10, 2012, Nevarez texted Tonna regarding Tonna's offer of a concert ticket. Nevarez stated, "My counselor says that I can only go if I take my own car, own transportation to Shoreline. If that is not acceptable then [] please find someone else to use the ticket." Tonna responded, "Did [you] mention to [your] counselor how [you] tore

---

[3] According to text messages, they met on February 20, 2012, March 9, 2012, March 26, 2012, March 31, 2012, and April 7, 2012.

3

my heart outta my chest?!?!" He then wrote, "Or how [you] Walked outta my door when I was completely falling apart???" Nevarez responded "Yes," and "Nevermind Cameron I hope you can find someone else to use the tic[ket]." Tonna continued to text Nevarez, who told him that she had spoken to her counselor. Her counselor knew she was "uncomfortable going" and had advised her not to go to the concert at all.

On April 12, 2012, Tonna sent Nevarez a text message stating that he was "seriously gonna hurt" someone named Jeremy. Tonna stated that he was "gonna let my fist through his face" and "make his face look like my wall." Tonna told Nevarez to delete Jeremy from her Facebook account.

On April 23, 2012, Nevarez wrote Tonna an email message saying she had talked to her counselor about "this past weekend." The message referred to an incident that had occurred at Tonna's apartment. Tonna had pushed Nevarez against a wall and tried to take her clothes off. Following that incident, Nevarez's counselor had suggested she get a restraining order against Tonna. Nevarez told Tonna that she would "like to refrain from doing so" but that Tonna needed to "stop harassing [her]." Tonna texted Nevarez, saying he had received her email and asking to talk on the phone. Nevarez refused, saying she wanted to correspond with him only by email. Nevertheless, Tonna continued to initiate communication with Nevarez via text message. Nevarez continued to suggest Tonna see a counselor and reiterated that her counselor thought she should not correspond with him at all. Nevarez also suggested that Tonna give her the concert tickets so she could attend the concert with her sister. On April 26, 2012, Tonna suggested Nevarez have dinner with him; he would give her the tickets afterwards. Nevarez stated, "I'm not comfortable seeing you really, especially at your apartment because of the last incident." Tonna promised "that won't happen" and said he just wanted to see her and talk to her. Nevarez agreed to see him that night.

Over the next few weeks, Tonna continued to text Nevarez, who asked him to email her instead. Tonna continued to ask to see her, and Nevarez continued to

4

encourage him to see a counselor. Tonna told Nevarez that he missed her, that he was always thinking about her, and that he really wanted to work things out. Nevarez responded politely and briefly to most, but not all, of Tonna's text messages. She declined to see him and encouraged him to message her instead of calling her. At the end of May, Nevarez agreed to briefly meet with Tonna. Tonna asked if they could meet for a longer period of time, and he repeatedly tried to see her sooner than they had agreed. They met for dinner on May 29, 2012.

### B. Incident on June 2, 2012

Nevarez went to Tonna's apartment on June 2, 2012, which was Tonna's birthday. Tonna had asked Nevarez to come pick up some things she had left there. Nevarez instructed Tonna to leave her belongings outside his upstairs apartment. When Nevarez arrived, her belongings were just inside the front door, which was open. She started to collect her belongings, but Tonna approached and grabbed her wrist, which left a bruise. After Tonna let her go, Nevarez picked up her belongings and began to leave. Tonna pushed Nevarez from the top of the stairwell, almost pushing her down the stairs. She was able to maintain her balance and leave.

Tonna texted Nevarez after the incident, saying she had been "cold" to him. Nevarez told Tonna not to contact her again. Tonna continued to send her text messages that day, one minute or less apart. Nevarez responded to some of the texts, saying "Take care," "Goodbye," and "do not contact me again."

Tonna also came by Nevarez's workplace that night. He came into the store and bought something, then waited for her outside. He would not allow her to get into her car, and he threatened to follow her home. At 12:04 a.m., he texted her that he needed to speak with her. Nevarez replied, "Please leave. Do not contact me again or I'll call the cops." Tonna continued to text her until 1:41 a.m., when he apologized. Tonna also texted Nevarez the next night, apologizing "for everything I did yesterday."

5

On June 4, 2012, Tonna emailed Nevarez, apologizing for his "behavior and actions." Tonna acknowledged he had "crossed a line." He also emailed her two days later, apologizing for "everything" he had done to her. He emailed her again several days later, apologizing again and asking for a "final good bye meeting." He also asked Nevarez to confirm she had read his email, suggesting she send a "blank email back," which she did. Tonna emailed Nevarez several more times in June, July, and August of 2012. He also sent her messages via Facebook.

Tonna also emailed Nevarez's mother following the June 2, 2012 incident, describing how he was upset that Nevarez just wanted to be friends. Nevarez's mother emailed back, saying, "[Nevarez] has a restraining order in place and I don't [want] to get neither one of us in trouble by conversing." She later corrected herself, writing, "[Nevarez] is in the process of getting a restraining order. I gave you false info and I apologize."

The day after the incident, Nevarez changed her phone number and began trying to find a new place to live. Nevarez began filling out paperwork for a restraining order at the end of June 2012. She obtained a work transfer on June 25. Also around the end of June 2012, a coworker saw defendant searching the parking lot of the Safeway where Nevarez had worked.

### C.     *July 27, 2012 Incident*

On July 27, 2012, Nevarez attended a concert with her sister. She did not tell Tonna that she would be at the concert, but Tonna had given her the tickets months earlier.

After the concert, Nevarez was in the driver's seat of her car, in the parking lot of Shoreline Amphitheater. She heard a loud bang on the passenger-side window, then saw Tonna come around to the driver's side. Tonna indicated that he wanted her to roll down her window. Nevarez and her sister "tried to ignore him," but Tonna continued to bang on the window and "kind of almost like climb[ed] on the car." Tonna repeatedly asked

6

Nevarez to roll down the window, saying "I want to talk, I want to talk." Finally, Nevarez rolled the window down just enough to tell Tonna "to leave [her] alone." Initially, Nevarez could not drive away because her car was "jammed" between other cars, but eventually she was able to "swerve out."

The next day, Tonna emailed Nevarez. He claimed he had not intended to make her uncomfortable, apologized that her sister "had to go through that," and asked her to stop ignoring his emails. The next day, Tonna emailed Nevarez again, telling her, "You looked really good that night[.]"

### D. Defense Testimony

Tonna denied that he had ever threatened Nevarez or used any physical force on her. He specifically denied ever grabbing her wrist or pushing her. He claimed that he went to Safeway after the June 2, 2012 incident only to get groceries. He admitted waiting for Nevarez in the parking lot that night, even though Nevarez had told him she did not want to talk. Tonna denied that he had blocked Nevarez's movements.

Tonna testified that on July 27, 2012, he saw Nevarez driving toward him in the Shoreline Amphitheater parking lot. They waved at each other. He approached and asked her to roll down the window, which she did. They conversed about school and family. Nevarez was answering him abruptly, which made him realize she did not want to talk. He turned to her sister and said, "sorry you had to see this," then walked away. Nevarez slammed on the gas pedal and drove off. Tonna denied banging on the window, but he admitted he might have stood in front of Nevarez's car.

Tonna's brother, Roger, testified that he had exchanged text messages with Nevarez on the night of June 2, 2012. Nevarez had texted him that "she was doing fine." Roger was also with Tonna on July 27, 2012. They saw Nevarez's car in the parking lot, and Tonna asked Nevarez to talk. Nevarez rolled down the window and spoke with Tonna, but in an angry or dismissive manner. Nevarez then "peeled off" in a reckless

7

manner. Tonna never hit any part of Nevarez's car, nor did he get in front of the car or block it.

### E. Restraining Order Proceedings

On August 2, 2012, Nevarez filed a request for a restraining order under the DVPA. The trial court granted a temporary restraining order and set the matter for a hearing. Tonna filed a response on August 22, 2012.

In addition to the testimony above, at the hearing Tonna claimed that he had seen Nevarez walking in his neighborhood on several occasions following the issuance of the temporary restraining order, and that he had made no contact with her. Tonna claimed he was ready to move on with his life and swore that he would not initiate any contact with Nevarez in the future.

At the hearing, Nevarez agreed that Tonna had left her alone since he had been served with the temporary restraining order. She described the experience as "amazing" and requested the restraining order become "permanent."

At the end of the hearing, the trial court stated its findings. The trial court found that most of the parties' post-breakup communication was "directed by" Tonna, who was "wanting to get back with" Nevarez. Nevarez told Tonna to leave her alone, but Tonna "kept at her." Tonna "did not take no for an answer." Nevarez "tried to be nice about it" and engaged in some communication with him.

Regarding the June 2, 2012 incident, the trial court found that Tonna had grabbed Nevarez. The court found that "what happened on June 2nd changed everything." Tonna continued communicating with Nevarez, but Nevarez did not respond. Nevarez started preparing a restraining order but did not file it because things "died down" after she changed her phone number, her workplace, and her apartment.

Regarding the July 27, 2012 incident, the trial court did not believe that Tonna "just happened" to see Nevarez's car. The court believed Nevarez did not want to roll down her car window and that Tonna's appearance frightened her.

8

The trial court specifically found Nevarez to be "very credible" and Tonna to be not "as credible." However, "for what it[']s worth," the trial court did believe that Tonna had "gotten the message that [the] relationship is over."

The trial court found that abuse had occurred, noting that the evidence had established abuse not just by a preponderance of the evidence but by clear and convincing evidence. The court found that Tonna's conduct justified issuance of a restraining order "notwithstanding [his] promise not to ever contact [Nevarez] again."

On November 28, 2012, the trial court issued a two-year restraining order, which included personal conduct orders and stay-away orders.

## III.   DISCUSSION

Tonna contends the trial court abused its discretion by issuing the restraining order. He contends the trial court was required to find not only that he had committed past acts of abuse but also that Nevarez feared future abuse, and he argues there was insufficient evidence to support both findings. Tonna also complains that the trial court erred in failing to allow his brother to produce a text message, and that the trial court showed bias by finding Nevarez credible. We begin with an overview of the legal standards and then proceed to analyze Tonna's claims.

### A.   *Statutory Background*

Under the DVPA, the trial court may issue an order "to restrain any person for the purpose of preventing a recurrence of domestic violence and ensuring a period of separation of the persons involved" upon "reasonable proof of a past act or acts of abuse." (§ 6300.)

The DVPA defines " 'abuse' " as meaning "any of the following:  [¶] (a) Intentionally or recklessly to cause or attempt to cause bodily injury.  [¶]  (b) Sexual assault.  [¶]  (c) To place a person in reasonable apprehension of imminent serious bodily injury to that person or to another.  [¶]  (d) To engage in any behavior that has been or

9

could be enjoined pursuant to Section 6320." (§ 6203.)  Behavior that may be enjoined pursuant to section 6320 includes "molesting, attacking, striking, stalking, threatening, sexually assaulting, battering, harassing, telephoning, . . . destroying personal property, contacting, either directly or indirectly, by mail or otherwise, coming within a specified distance of, or disturbing the peace of the other party."

On appeal, we review the trial court's issuance of a restraining order under the DVPA for abuse of discretion.  (*S.M. v. E.P.* (2010) 184 Cal.App.4th 1249, 1264 (*S.M.*); *In re Marriage of Nadkarni* (2009) 173 Cal.App.4th 1483, 1495.)

### B.    Analysis

#### 1.    Fear of Future Abuse

Tonna contends that the trial court could not issue a restraining order without finding a probability that he would commit future abuse.  Tonna points out that the trial court indicated it believed Tonna had "gotten the message that [the] relationship is over" and that he had promised "not to ever contact [Nevarez] again."

Tonna relies primarily on *Ritchie v. Konrad* (2004) 115 Cal.App.4th 1275 (*Ritchie*) for the proposition that a probability of future abuse is required for issuance of a restraining order under the DVPA.  However, that court was addressing the requirements for renewal of a DVPA restraining order under section 6345,[4] not issuance of a restraining order in the first instance.  As noted above, under section 6300, the trial court may issue a restraining order under the DVPA upon proof of "reasonable proof of a *past act or acts of abuse.*"   (Italics added; see also *Nakamura v. Parker* (2007) 156 Cal.App.4th 327, 334 ["A trial court is vested with discretion to issue a protective order under the DVPA simply on the basis of an affidavit showing past abuse."].)

---

[4] Section 6345, subdivision (a) provides that "the personal conduct, stay-away, and residence exclusion orders contained in a court order issued after notice and a hearing . . . may be renewed . . . without a showing of any further abuse since the issuance of the original order . . . ."

10

Tonna also relies on section 6220, which states that the purposes of the DVPA are "to prevent the recurrence of acts of violence and sexual abuse and to provide for a separation of the persons involved in the domestic violence for a period sufficient to enable these persons to seek a resolution of the causes of the violence." We decline Tonna's invitation to read into section 6220 an additional requirement for obtaining a restraining order under the DVPA. As stated, section 6300 is the provision specifically governing issuance of a restraining order under the DVPA, and it states that an order may issue upon "reasonable proof of a *past* act or acts of abuse." (Italics added.)

In sum, the trial court was not required to find a probability that Tonna would commit future abuse before issuing a restraining order under section 6300.

### 2. Past Abuse

Tonna contends the trial court abused its discretion in finding that he committed "any abuse at all." Tonna contends that his conduct was, at most, "mere 'badgering.' " Tonna notes that Nevarez's sister even referred to his conduct on July 27, 2012 as "badgering."

Tonna relies on *S.M., supra,* 184 Cal.App.4th 1249, in which the court held that "badgering" did not rise to the level of "harassment or abuse" justifying issuance of a restraining order under the DVPA. (*Id.* at p. 1266.) That case involved the parents of a minor child; they had an argument one night after the father refused to give the mother permission to take the child out of state. The mother did not allege that anything " 'physical' " had happened, but she claimed the father had threatened her. (*Id.* at p. 1261.) The trial court found the father had not made a threat but that he had been " 'badgering' " the mother during the argument. (*Id.* at p. 1263.) The appellate court determined that the father's behavior did not constitute "conduct that placed [the mother] in reasonable fear of serious bodily injury or that he engaged in a type of behavior identified in section 6320." (*Id.* at p. 1265.)

11

Here, there is evidence to support the trial court's finding that Tonna committed "abuse" within the meaning of section 6203. Tonna intentionally or recklessly caused bodily injury, caused Nevarez to reasonably fear imminent serious bodily injury, and engaged in behavior that could be enjoined by section 6320 when he grabbed Nevarez's wrist, which left a bruise, and pushed her on a stairwell on June 2, 2012. (See §§ 6203, subds. (a), (c), & (d), 6320 [listing attacking and striking as behaviors that may be enjoined].) Following the June 2, 2012 incident, after Nevarez told him to stop contacting her, Tonna harassed, telephoned, contacted, and disturbed the peace of Nevarez when he sent her repeated text messages and emails, often in the middle of the night, and when he came to Nevarez's workplace and prevented her from getting into her car. (See §§ 6203, subd. (d), 6320; *Ritchie, supra,* 115 Cal.App.4th at pp. 1290-1291 ["protective orders can be issued because of persistent unwanted phone calls or letters— which fall into the same category as 'molesting, attacking, striking, stalking, threatening, sexually assaulting, battering, [or] harassing' the protected party"]; *Burquet v. Brumbaugh* (2014) 223 Cal.App.4th 1140, 1144 [after termination of their romantic relationship, defendant disturbed plaintiff's peace by repeatedly contacting her by phone, email, and text, and by coming to her house "unannounced and uninvited," then refusing to leave].) Finally, on July 27, 2012, Tonna harassed, contacted, and disturbed the peace of Nevarez when he banged on the window of her car and repeatedly insisted she roll down her window and speak with him. (See §§ 6203, subd. (d), 6320.) Whereas in *S.M.* the parties had only one argument that involved no physical violence, here there was not only physical violence but ongoing and unwanted contact and harassment. On this record, the trial court did not abuse its discretion by finding that Tonna engaged in "abuse" within the meaning of the DVPA.

### 3.    Roger Tonna's Proffered Evidence

Tonna claims the trial court abused its discretion by failing to look at text messages on his brother Roger's cell phone.

At the hearing, Roger testified that he had texted Nevarez on June 2, 2012 and expressed worry that Tonna would not come out of his room. Nevarez had responded, saying she had broken up with Tonna and that he was fine. Roger wrote back, "well, I hope we can see you around again." Roger offered to show the trial court the messages. The trial court responded, "No, I'm not going to." Roger then reiterated that he had texted Nevarez to ask her "what happened" and that Nevarez texted back that she and Tonna had broken up. Roger further testified that he asked Nevarez "how she was doing" and that Nevarez responded "she was doing fine."

Tonna contends the trial court's refusal to look at Roger's text messages "shows an abuse of discretion." However, he did not object below and does not support his argument with any citation to authority. We therefore need not consider this claim. (See *In re S.B.* (2004) 32 Cal.4th 1287, 1293 ["a reviewing court ordinarily will not consider a challenge to a ruling if an objection could have been but was not made in the trial court"]; *Nein v. HostPro, Inc.* (2009) 174 Cal.App.4th 833, 855 [where a party "fails to make a legal argument or to cite any legal authority" in support of a contention, the claim is forfeited on appeal].) Even if we were to consider the claim, however, we would find that the trial court did not abuse its discretion by refusing to look at the cell phone because Roger Tonna testified to the contents of the text messages and thus the messages themselves would have been cumulative. (See Evid. Code, § 352.) For the same reason, we would find any error was harmless. (See *In re Marshall K.* (1970) 14 Cal.App.3d 94, 100-101 [error in excluding demonstrative evidence was harmless where the evidence "was substantially before the court by oral testimony"].)

### 4. Credibility Determination/Bias

Tonna asserts the trial court was biased in favor of Nevarez. He claims such bias was shown by the trial court's refusal to review his brother's text messages, by making an erroneous factual finding concerning the number of times the parties met, and by finding Nevarez more credible than him. Tonna contends that the trial court could not have

13

found Nevarez credible because she did not describe the June 2, 2012 push in her restraining order application and because she brought up the April attempted sexual assault "for the first time" in the rebuttal part of the case.

Tonna does not appear to argue that the trial court was not qualified to hear the case due to bias against him, and he made no such argument below. (See Code of Civ. Proc., § 170.1, subd. (a)(6).) We observe: "Mere expressions of opinion by a trial judge based on actual observation of the witnesses and evidence in the courtroom do not demonstrate a bias. [Citations.] Moreover, a trial court's numerous rulings against a party—even when erroneous—do not establish a charge of judicial bias, especially when they are subject to review. [Citations.]" (*People v. Guerra* (2006) 37 Cal.4th 1067, 1111-1112, overruled on another ground by *People v. Rundle* (2008) 43 Cal.4th 76, 151.)

It appears that Tonna is arguing, instead, that this court should reject the trial court's credibility findings. However, "[i]t is the trial court's role to assess the credibility of the various witnesses, to weigh the evidence to resolve the conflicts in the evidence. We have no power to judge the effect or value of the evidence, to weigh the evidence, to consider the credibility of witnesses or to resolve conflicts in the evidence or the reasonable inferences which may be drawn from that evidence. [Citations.]" (*In re Casey D.* (1999) 70 Cal.App.4th 38, 52-53.) On appeal, "[t]estimony may be rejected only when it is inherently improbable or incredible, i.e., ' "unbelievable *per se*," ' physically impossible or ' "wholly unacceptable to reasonable minds." ' [Citations.]" (*Oldham v. Kizer* (1991) 235 Cal.App.3d 1046, 1065 (*Oldham*).)

We disagree that the trial court demonstrated bias or erred by finding Nevarez credible. First, as explained above, the trial court did not improperly refuse to review the text messages from Tonna's brother because his brother testified to the contents of the messages. Second, although the trial court may have misstated the number of times Tonna and Nevarez met between January and June of 2012, indicating that they had seen each other "maybe once, maybe twice a[t] the most," the trial court did not rely on

14

anything that occurred prior to June 2, 2012 in finding the evidence supported issuance of a restraining order. The trial court explicitly found that "what happened on June 2nd changed everything." Third, Tonna is not correct when he asserts that Nevarez did not describe the June 2, 2012 push in her restraining order application: she wrote that he "attempted to push me." Finally, the trial court could find that Nevarez was credible in describing the April attempted sexual assault, despite the fact that she brought it up "for the first time" in the rebuttal part of the case, because Nevarez had referred to the incident in emails and text messages at the time of that incident. Nevarez's testimony was not "inherently improbable or incredible" such that this court should reject the trial court's determination regarding her credibility. (*Oldham, supra,* 235 Cal.App.3d at p. 1065.)

## IV.    DISPOSITION

The November 28, 2012 injunctive order is affirmed.


_____

BAMATTRE-MANOUKIAN, ACTING P.J.


WE CONCUR:


_____

MÁRQUEZ, J.


_____

GROVER, J.

Trial Court:                                        Santa Clara County Superior Court
                                                    Superior Court No.:  DV016124


Trial Judge:                                        The Honorable Dolores A. Carr


Attorney for Plaintiff and Respondent:              Taylor & Company Law Offices, LLP
Angela Nevarez                                      Joshua Ryan Benson


Attorneys for Defendant and Appellant:              William E. Gilg
Cameron Roger Tonna