Filed 12/14/20  Leon v. Leon CA2/4

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| JOHN OHANIS LEON, | B297337 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. 18CHR002133) |
| v. | |
| MAIDA LEON, | |
| Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Jonathan L. Rosenblum, Judge.  Affirmed.

Agavni Tulekyan for Appellant.

Noelle M. Halaby for Plaintiff and Respondent.

Maida Leon appeals from the entry of a domestic violence restraining order (DVRO) against her.  She contends the trial court committed several errors and ultimately abused its discretion in granting the DVRO requested by her husband, respondent John Leon.[1]  We affirm.

### FACTUAL AND PROCEDURAL HISTORY

### I.    *DVRO Petition*

John filed a request for a DVRO on December 21, 2018.  He sought protection from Maida for himself and their three-year-old son, S.L.  At the time, Maida and John were married and living together.  John also sought a custody order granting him legal and physical custody of S.L.

In an attached declaration, John stated that Maida had a "violent temper which has grown over the years," with "escalating aggression."  He claimed that Maida had engaged in verbal abuse and "physically attacked" him, and he was terrified of her actions and concerned for his and S.L.'s safety.  John declared that Maida told S.L. he was "stupid," yelled and screamed at S.L., and hit his hands. He noted that S.L. had been diagnosed as autistic and had associated behavioral issues.

According to John, on November 30, 2018, Maida was on the telephone with her mother.  From another room, John heard Maida scream angrily at S.L., who began to cry.  When John went to see what was happening, Maida began yelling at John, calling him "stupid."  John picked up S.L. While he was holding the child, Maida "hit and pinched me hard enough that she left a mark on my arm."  She also continued to scream at him.  John

---

[1]We refer to the parties by their first names to avoid confusion.

2

called the police the next day, December 1, 2018, and the Department of Children and Family Services (DCFS) began an investigation.

John further stated that while a DCFS social worker was interviewing him on December 7, 2018, Maida's brother, Sivak Kotoian, arrived at their home and "started screaming at me saying he was going to 'take care of me.'" John called the police. John also stated that he had become increasingly concerned for his and S.L.'s safety over the last several months, that Maida had threatened that she would "have [her] brother take care of [me]" and asked him once whether he thought she was going to poison his food. John stated that Maida had been acting more erratic and her behavior had become more physically violent. He opined that Maida's "volatile attitude" was stressful and detrimental to S.L.

The court granted John's request and issued a temporary restraining order on December 21, 2018. The court set a hearing on the permanent restraining order for January 11, 2019.

## II.    *Maida's Response*

Maida filed a response to the DVRO request on January 3, 2019. In her declaration, Maida stated that she had filed a petition for dissolution of marriage on December 21, 2018, the same day John filed the DVRO request. She claimed that she and John had been having "irreconcilable differences for several months," and he had been "physically and verbally abusive." Maida also stated that John had been making changes over the past six months without her knowledge, including removing money from their joint bank accounts, removing her from their home business, changing the locks on the home office and storage units, taking away her cell phone and social media accounts,

3

removing her access to their home security cameras, and threatening that "if I don't move out of his home, he will continue taking more things away until I have nothing left."

Maida stated that when the social worker visited on December 7, 2018, Maida called her brother to help with the interview because she does not speak English. She claimed that John started an argument with her brother and then called the police. Maida stated she learned from the social worker that John had filed a police report claiming abuse. According to Maida, the social worker suggested Maida leave the house with S.L., but Maida decided to stay to ensure stability for S.L.

Maida contended that John "fabricated the facts regarding the alleged abuse . . . in order to have me removed from our home." She attached a letter from DCFS reporting that the referral was closed based on a determination that the allegations of emotional abuse were inconclusive.

In a supplemental declaration filed February 13, 2019, Maida stated she was not able to see S.L. for three weeks after the court granted the temporary restraining order on December 21, 2018. In January 2019, Maida began to have monitored visits with S.L. She stated that her visits were going "very well" but that S.L. was having difficulty adjusting to the drastic change, as she had previously been his primary caregiver. She attached a letter from the CHIME Institute, stating that she and S.L. had participated in a toddler early intervention program from July 2017 to June 2018 and that S.L. made "great strides" in his developmental progress during that time.

Maida's attorney also filed a declaration stating that Maida retained her on December 18, 2018 to prepare her petition for dissolution of marriage, which Maida filed on December 21, 2018.

4

Maida's attorney also stated that she first received notice of John's request for a DVRO late in the evening on December 21, 2018.

### III. *DVRO Hearings*

The court held hearings on the DVRO on January 11, February 26, March 4, and March 12, 2019. An Armenian interpreter assisted Maida during the testimony portion of the hearings. The trial court admitted into evidence the declarations filed by both parties.

John called his brother, Harry Leon, and himself as witnesses. Harry testified that John called him on November 30, 2018 and reported that Maida had hit John and S.L. John told Harry that Maida had hit and pinched him and tried to push him while he was holding S.L. John also sent Harry pictures of bruises on his arm.

John testified about the November 30 incident. He stated that he was in the living room and Maida and S.L. were in the bathroom, when he heard Maida yell, heard a slap, and then S.L. started crying. He went into the bathroom and asked what had happened. Maida said, "he is not listening to me. Your kid is stupid." She then left the room and John tried to comfort S.L. As he was carrying S.L. to his room, Maida hit and pinched John. She also said, "[M]y brother is going to come and take care of you." John acknowledged that he did not call the police on the day of the incident, because he was afraid that they would take S.L. and/or arrest Maida. He went to the police station to file a report the following day. On cross-examination, John testified that this incident was the first time Maida had hit him.

John also testified that he had previously seen Maida exhibit similar behavior toward S.L. She would call S.L. names

5

when he would misbehave.  He told Maida, "from now on, I am going to record you. . . .  Every time I hear you, that you are doing something, I am going to record you." Maida responded that she did not care.

John later made two recordings of Maida interacting with S.L.  Over Maida's objection, John played the recordings for the court.[2]  As captured on one of the recordings, John heard Maida say "I will slap you," and then heard her slap S.L.

According to John, Maida became angrier at him the prior summer when John refused to sponsor her for immigration proceedings.  He said Maida threatened to take S.L. away if he did not sign the required documents.  He denied Maida's allegations that he had threatened to take S.L. away from her and demanded $25,000 to sign her immigration papers.  He denied threatening Maida with deportation if she called the police.  He also denied Maida's claim that she was unable to access any of their community funds, testifying that Maida was able to access their joint bank account and had done so with her debit card.  He confirmed that he put a lock on the door of their home office because Maida had "sabotaged the business" by throwing out some items.  He also denied Maida's claim that he took her cell phone, and presented a phone log showing continued use of the phone in January.  He also testified that Maida hit their home security cameras with an orange cone and tried to break them.

Maida called herself, her brother, Sivak Kotoian, and her

---

[2]The transcript of these recordings is not in the record on appeal.  The only evidence in the record regarding the recordings is the parties' discussion of it during their testimony.  We discuss the admission of the recordings in further detail below.

6

mother, Sita Markosian, as witnesses.  Maida testified that at the time of the incident, she and S.L. were talking to Markosian on the phone through Facetime and they were "laughing, happy." John came to the door of the room and told Markosian that she and Kotoian "hopefully . . . are going to die."  Maida asked John, "What is going on?  What are you saying?"  S.L. began to cry because they were speaking loudly, and John picked him up. John also pushed Maida. Maida denied punching or pinching John during the incident.

Maida denied physically abusing John or S.L. at any time. She admitted spanking S.L. on the bottom and telling him, "don't be stupid."  She also admitted it was her voice on the audio recordings.  At one point on the recording, she called S.L. a "donkey."  She testified that she often used the word as a joke and it made S.L. laugh, but in this instance she was angry and S.L. "was crying loudly because I was also yelling."  But she claimed that "donkey" in Armenian did not have a derogatory meaning.  She denied slapping S.L. but then admitted "maybe" slapping his hand, which could be heard on the recording.

Although Maida stated in her declaration that John had removed her from all social media accounts, she admitted during the hearing that she had access to her Facebook and Instagram accounts.  She also admitted that John did not take away her cell phone, but changed the password.  She also recanted her prior statement in the declaration that John had removed her from their joint bank accounts.  Maida testified that she "believed" it was true because she tried to use her bank card once and it was declined.  But when she later used her card to access the account, it worked.

Maida's brother testified that he had never seen Maida

abuse S.L. or John.  Maida's mother, Markosian, testified that she had never seen Maida abuse S.L., although "sometimes she gets angry of course."  Markosian also stated that she would never call someone a "donkey" because "it is a curse."  Markosian testified that on the day of the incident, she and Maida were on the phone when John came in and accused Markosian of sleeping with his uncle.  Markosian became angry and hung up.  Markosian also testified that she had never seen Maida abuse John.

IV.  *Ruling*

At the conclusion of the hearing, the court issued its ruling granting the DVRO.  The court began by acknowledging that "[i]t is always difficult to second guess what a parent does, especially when the parent is the parent of a child with special needs.  And what went through my mind, among other things, as I listened to the testimony, is that Ms. Leon might be feeling very isolated and quite possibly a little bit burned out caring for her son.  And I think any child that age can be challenging.  You add to it, a child's special needs and it is exponentially more difficult. . . . And I know that Ms. Leon's English, while workable, is not perhaps proficient. . . .  [¶]  All of this is to say that my conclusion from this testimony is that Ms. Leon is certainly at times and perhaps all the time under a great deal of stress and I think that this affects her care-giving and her ability to parent S[.L.].  [¶] So then I look at the other evidence.  And the recording was in my mind the most striking, literally and figuratively in some ways, piece of evidence.  I think that gave me the closest I will get to a front row center seat at what life must be like in this household.  [¶]  I also saw Mr. Leon's reaction to it, which was tears, and Ms. Leon's reaction to it, which was nothing.  [¶]  And that made an

8

impression on me."

The court next explained the "three aspects" required for a DVRO. First, the court found the parties had a qualifying relationship, as they lived together and shared a child. Second, the court reviewed "the evidence before me to see whether any of it fits within the categories of domestic abuse," such as whether "someone has attacked, struck, threatened, battered." Here, the court found that John alleged Maida struck him and also abused S.L. Third, the court stated it "look[ed] to the burden of proof, which often is a judge's best friend, and here it is a lower burden of proof, which is a preponderance of the evidence. And from that I conclude that abuse may have happened."

Additionally, the court indicated it looked at the parties' credibility and found that "Mr. Leon and his brother's story held together and that their emotions aligned with the facts that they were telling me. By contrast, when Ms. Leon testified, there were inconsistencies and the same was true with her brother." Finally, the court concluded: "So with all of that in mind, and with the point that [John's counsel] made with her closing, which was the reaction to the recording that we heard, that there wasn't an apology, there was no statement that this was a bad day, there was no acknowledgement that, that Ms. Leon has, I think by anybody's estimation, a difficult and seemingly never-ending task in front of her, so I take all of that into account and I certainly take no pleasure in granting a restraining order."

Accordingly, the court granted a three-year DVRO protecting John and S.L. and awarded John sole legal and primary physical custody of S.L., with supervised visitation for Maida.

9

Maida timely appealed.[3]

## **DISCUSSION**

Maida contends the trial court committed several errors in granting John's request for a DVRO against her. First, she argues that the court improperly admitted the audio recordings made by John over her objection that they were made without her consent. She also contends the court relied on her reactions to hearing those recordings, even though she was not testifying as a witness at the time. Second, she claims the court abused its discretion when it excluded her testimony regarding prior abuse by John. Finally, she argues that the court failed to make proper findings of fact to support the DVRO, relying instead on other proceedings. We conclude that Maida has failed to establish any of the asserted errors and therefore affirm.

## I.   *Legal Standards*

Pursuant to the Domestic Violence Prevention Act (DVPA), (Fam. Code, § 6200 et seq.),[4] a court may issue a protective order "'to restrain any person for the purpose of preventing a recurrence of domestic violence and ensuring a period of separation of the persons involved' upon 'reasonable proof of a past act or acts of abuse.'" (*Nevarez v. Tonna* (2014) 227 Cal.App.4th 774, 782 (*Nevarez*), quoting § 6300.)

The DVPA defines domestic violence, as relevant here, as abuse perpetrated against a spouse, cohabitant, or the child of a party. (§ 6211, subds. (a), (b), & (e).) "Abuse" includes: "(1) Intentionally or recklessly to cause or attempt to cause bodily injury[;] . . . (3) To place a person in reasonable apprehension of

_____

[3]Respondent has not filed a brief in this appeal.

[4]All further statutory references are to the Family Code unless otherwise indicated.

10

imminent serious bodily injury to that person or to another[; or] (4) To engage in any behavior that has been or could be enjoined pursuant to Section 6320." (§ 6203.)  The behaviors outlined in section 6320 include "attacking, striking, . . . threatening, . . . battering, [or] harassing."  (§ 6320.)  The DVPA requires a showing of past abuse by a preponderance of the evidence.  (*In re Marriage of Davila and Mejia* (2018) 29 Cal.App.5th 220, 226 (*Davila*); see also *Cooper v. Bettinger* (2015) 242 Cal.App.4th 77, 90, fn. 14; *Gdowski v. Gdowski* (2009) 175 Cal.App.4th 128, 137.)

"[I]t is a fundamental principle of appellate procedure that a trial court judgment is ordinarily presumed to be correct and the burden is on an appellant to demonstrate, on the basis of the record presented to the appellate court, that the trial court committed an error that justifies reversal of the judgment." (*Jameson v. Desta* (2018) 5 Cal.5th 594, 608-609.)  We review the grant or denial of a request for a DVRO for abuse of discretion. (*Davila, supra*, 29 Cal.App.5th at p. 226, citing *In re Marriage of G.* (2017) 11 Cal.App.5th 773, 780.)  We likewise review the trial court's failure to consider evidence in issuing a DVRO for an abuse of discretion.  (See *Nevarez, supra*, 227 Cal.App.4th at p. 785; *Davila, supra*, 29 Cal.App.5th at p. 226.).

"'To the extent that we are called upon to review the trial court's factual findings, we apply a substantial evidence standard of review.'" (*Davila, supra*, 29 Cal.App.5th at p. 226, quoting *In re Marriage of G.*, *supra*, 11 Cal.App.5th at p. 780.)  We "view the whole record in a light most favorable to the judgment, resolving all evidentiary conflicts and drawing all reasonable inferences in favor of the decision of the trial court.  (*Melissa G. v. Raymond M.* (2018) 27 Cal.App.5th 360, 373–374.)

## II.   *Admission of Recordings*
### A.   *Background*

John testified during his case-in-chief that, prior to recording Maida, he warned her that he would do so if she was acting inappropriately with S.L.  John further testified that Maida told him she did not care.  When John sought to introduce the recordings as evidence, Maida's counsel objected that the recordings were made without Maida's consent.  John's counsel argued that the recordings were made with Maida's knowledge.  When questioned by the court, John reiterated that Maida responded after each warning: "Go ahead. Record me. I don't care."  Maida's counsel asked the court to postpone its ruling on the admissibility of the recordings until it heard from Maida, as she would testify that she did not know she was being recorded.  The court agreed that it would "hold off until we have that testimony. . . .  [¶] I'm not saying it won't come in.  But not at this point."

At the next hearing, before John rested, his counsel again sought to introduce the recordings as part of John's case-in-chief.  Maida's counsel renewed her objection and request that the court wait to rule until after Maida testified.  The court noted the dispute regarding consent to recording, then stated that "just for the purposes of moving this along, I don't think there is any harm in having [John] introduce those as part of your case-in-chief."  Maida's counsel again noted that Maida would testify that she did not give permission to be recorded.

John's counsel replied that in addition to John's testimony that Maida consented, the recordings were also admissible under an exception in Penal Code section 633.5, where a person reasonably believes a recording is necessary to obtain evidence of

12

domestic abuse.  The court indicated that "I don't really think this is going to be momentous one way or another and I think for purposes of credibility, let's just have this as part of your case-in-chief."

John resumed testifying and the recordings were played and discussed during his testimony. At the close of his case, John's counsel moved to admit his exhibits into evidence, including the recordings.  Maida's counsel did not object.

Maida did not testify about the recordings or whether she knew or consented to them.  During her closing argument, Maida's counsel referred to the recordings that John "took of my client over the objection that it was made without my client's permission."

John's counsel also referenced the recordings during her closing argument.  She argued that Maida had taken no responsibility for her behavior, noting that Maida "had a smirk on her face" when John's counsel asked her: "did you hear your son crying [on the recordings] and saying, 'I'm not a donkey, I'm not a donkey,' when he was crying?"  She argued that Maida "doesn't accept responsibility.  She didn't come to the testimony and say, you know what, I heard that, and I'm really disturbed by listening to that.  And I would never do that again."

**B.    *Analysis***

Maida argues that the court erred in admitting the recordings over her objection that she did not consent to being recorded.  Under Penal Code section 632, the intentional electronic recording of a confidential communication without the consent or knowledge of all parties is illegal, and the recording is inadmissible (with certain exceptions) in a judicial proceeding. (Penal Code, § 632, subds. (a) and (d).)

13

Here, however, John testified that he warned Maida that he was going to record her when she was abusive toward S.L., and Maida told him she did not care. Thus, he met his burden to establish that the recordings were obtained with Maida's knowledge and consent, and were therefore admissible. Despite her counsel's objection, Maida did not actually present any evidence to rebut this showing.[5] Although her counsel told the court that Maida planned to testify to the contrary, she never did so, and Maida never renewed her objection or asked the court to revisit its ruling at the close of evidence. As such, it was not an abuse of discretion for the court to rely on John's uncontroverted testimony that Maida knew of and consented to being recorded and to admit the recordings on that basis.

We also reject Maida's contention that the trial court improperly relied on Maida's courtroom demeanor—specifically, her lack of a response when the recordings were played—as evidence. Contrary to Maida's suggestion, the record demonstrates that the trial court considered Maida's demeanor and lack of remorse *while she was testifying* at the hearing. In her closing arguments, John's counsel remarked on Maida's failure to offer any apology or explanation for her conduct, although she had the chance to do so when she testified after the recordings were played. The court expressly cited this same evidence when finding Maida was less credible because of her reaction to the recording, noting that "there wasn't an apology, there was no statement that this was a bad day, there was no acknowledgement" by Maida that she was having a difficult time caring for her son. We find no basis in the record to conclude that

[5]We note that Maida's recitation of the facts supporting this argument is incomplete, if not misleading.

14

the trial court relied on Maida's demeanor off the witness stand. As such, Maida has not established error.[6]

### III.    *Exclusion of Prior Abuse*

Maida next argues that the court erred in excluding her testimony regarding past abuse by John.  When Maida sought to testify regarding abuse by John against her over the past two years, the court sustained John's relevance objection.  Maida contends the court was required to consider the "totality of the circumstances" before issuing a DVRO, and that her testimony regarding past abuse was relevant as evidence of self-defense and a "basis for her alleged behavior."

Maida acknowledges that she was permitted to testify regarding her version of the November 30 incident at issue, including her claim that John pushed her and that she did not punch or pinch John or S.L.  Although she asserts that her testimony regarding past abuse would have been relevant to a claim of self-defense, she does not explain how a claim of self-defense would have been consistent with her testimony here. Because she testified that she did not respond with force when John pushed her,  there would be no basis for her to claim that she reacted in self-defense with force she believed necessary to protect herself.  (See Civ. Code, § 50 ["Any necessary force may be

---

[6]We similarly reject Maida's argument that the trial court improperly relied on the "lack of an apology" to grant the DVRO. Maida fails to cite to any authority supporting this assertion. (See *Nein v. HostPro, Inc.* (2009) 174 Cal.App.4th 833, 855 [where a party "fails to make a legal argument or to cite any legal authority" in support of a contention, the claim is forfeited on appeal].)  Moreover, as discussed, the court cited Maida's failure to apologize or offer an explanation for her behavior heard on the recordings as evidence supporting its credibility findings.

15

used to protect from wrongful injury the person or property of oneself, or of a . . . child."])  Nor does she explain the relevance of any past abuse by John to the evidence that she verbally abused S.L. and struck the child on more than one occasion.  As such, we find no abuse of discretion in the trial court's exclusion of the evidence as irrelevant to John's allegations of abuse supporting the DVRO.

## IV.    *Errors in Court's Findings*

Maida also contends the trial court failed to make proper findings of fact to support issuance of a DVRO, citing the court's statement that "abuse may have happened."  We are not persuaded.

As an initial matter, Maida improperly relies on the requirements for issuing *mutual* orders restraining both parties under section 6305.  That section requires "detailed findings of fact indicating that both parties acted as a primary aggressor." (§6305, subd. (a)(2); see also *Melissa G. v. Raymond M.*, *supra*, 27 Cal.App.5th at p. 373 ["[t]he court erred when it issued the mutual order without making the findings required under section 6305"].)

Here, issuance of the single restraining order did not trigger the requirements of section 6305. As noted above, under section 6300, the trial court may issue a restraining order under the DVPA upon proof of "reasonable proof of a past act or acts of abuse."  (*Nevarez, supra*, 227 Cal.App.4th at p. 783; see also *Nakamura v. Parker* (2007) 156 Cal.App.4th 327, 334 ["A trial court is vested with discretion to issue a protective order under the DVPA simply on the basis of an affidavit showing past abuse."].)

16

We also disagree that the evidence was insufficient to support a finding of reasonable proof of past acts of abuse by Maida. Her description of the alleged abuse as "a single incident where Respondent accused Maida's mother of sleeping with his uncle and thereafter Appellant pinched or hit Respondent one time" is both inaccurate and incomplete. In addition to the November 30 incident, John testified that Maida was verbally abusive to him and to S.L. on numerous occasions, and that she hit or slapped S.L. John also presented two recordings to support his allegations regarding Maida's behavior toward S.L., as well as photographs showing bruising to John's body from the November 30 incident. The court found John and his brother's testimony credible. Conversely, while it sympathized with Maida's position, the court found her testimony, as well as her brother's, lacked credibility. The court was entitled to consider all of the evidence and to weigh the credibility of the parties. We will not revisit these assessments on appeal. "'It is the trial court's role to assess the credibility of the various witnesses, to weigh the evidence to resolve the conflicts in the evidence. We have no power to judge the effect or value of the evidence, to weigh the evidence, to consider the credibility of witnesses or to resolve conflicts in the evidence or the reasonable inferences which may be drawn from that evidence.'" (*Nevarez, supra,* 227 Cal.App.4th at p. 786, quoting *In re Casey D.* (1999) 70 Cal.App.4th 38, 52–53.) The trial court's statement at the hearing that "abuse may have happened," cannot be considered alone. When considered in combination with the court's detailed findings regarding the parties' credibility, the evidence of abuse, and the burden of proof, substantial evidence supports a finding of abuse by Maida.

17

Maida also argues that the court "decided to grant the restraining order based on the answers to his questions regarding the parallel divorce proceedings." This contention is not supported by the record. Following closing arguments, the court indicated it had "a couple questions" for both parties "and then I will, based on your answers, I will rule." The court then asked whether, if it granted the DVRO and issued visitation orders, those orders would be "at cross-purposes" with any orders made at an upcoming hearing in the divorce proceeding. John's counsel answered that there was no conflict. The court also confirmed with John's counsel that the requested permanent DVRO was the same in scope as the previously-issued temporary order, and that the visitation monitor was a professional monitor.

Maida suggests that these questions and statements by the court show an improper reliance on other proceedings. We disagree. The record here demonstrates that the court inquired about the divorce proceedings for the sake of consistency in ruling on child custody and visitation. We find no indication, nor does Maida point to any, that the court relied on findings made in another proceeding as a substitute for the requisite finding of abuse here. As such, the cases Maida cites are inapposite. (See *Lugo v. Corona* (2019) 35 Cal.App.5th 865, 870 [finding that "criminal and civil protective orders may coexist, and . . . [t]he trial court therefore erred by summarily denying Lugo's DVRO request on the basis that a criminal protective order was already in place"]; *Isidora M. v. Silvino M.* (2015) 239 Cal.App.4th 11, 23 ["the trial court erred in substituting the bare fact of Isidora's guilty plea to a charge of domestic violence for detailed findings of fact indicating that she acted primarily as an aggressor and not primarily in self-defense as required by section 6305" for

entry of mutual restraining orders].)

Accordingly, we conclude that Maida has not established that the court erred in granting the DVRO.  Because we have found no error, we also reject Maida's claim that the combination of errors cumulatively "resulted in an unfair trial."

## DISPOSITION

The judgment is affirmed.  Respondent may recover his costs on appeal.

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

COLLINS, J.

We concur:

MANELLA, P. J.

CURREY, J.

19