Filed 12/15/15  Marriage of Minkey CA1/5

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIRST APPELLATE DISTRICT

## DIVISION FIVE

| | |
|---|---|
| In re the Marriage of JESICA and HARRY MINKEY. | |
| JESICA MCINTYRE,<br><br>        Appellant,<br><br>v.<br><br>HARRY MINKEY,<br><br>        Respondent. | A143625<br><br>(San Francisco City and County Super. Ct. No. FDI-09-769752) |

During the course of a dissolution action, the trial court granted Jesica McIntyre's request for a domestic violence restraining order (DVRO)[1] against her then-husband, Harry Minkey.  The following year, McIntyre requested a five-year renewal of the DVRO and produced proof of Minkey's continuing communications in violation of the order.  The court declined to issue the renewal, instead "warning" Minkey of the consequences of further violations.  McIntyre appeals.  We conclude the court abused its discretion and reverse with directions to grant renewal of the DVRO.

---

[1] The DVRO was issued pursuant to the Domestic Violence Prevention Act (DVPA) (Fam. Code, § 6200 et seq.).  All further undesignated statutory references are to the Family Code.

# I. BACKGROUND

## A. *2011 DVRO Proceedings*

In March 2011, McIntyre requested a DVRO against Minkey on behalf of herself and the parties' children—a daughter and two sons, then ages 14, 6, and 3. McIntyre alleged a lengthy history of abuse by Minkey.

McIntyre averred that in 1999, the year they started dating, Minkey mounted her on the bed, held down her shoulders, spat on her, and screamed profanities at her. In another incident that year, he kicked a bathroom door open, grabbed McIntyre by the neck, and slammed her against a medicine cabinet. Minkey also punched holes in doors when he became upset. After the couple broke up in 2001, Minkey stole McIntyre's car, broke into her residence, and verbally abused her. In 2003, after they reunited, Minkey came home drunk, pushed McIntyre to the ground, verbally abused her, and had to be restrained by a friend from following her into another room.

Two years after their 2005 marriage, McIntyre told police Minkey swung his arm at her during an argument, grabbed and pulled her hair, raised a clenched fist, verbally abused her, and hit her in the face with a pillow while she was holding their infant son. In 2008, Minkey came home drunk and verbally abused McIntyre; she and the children barricaded themselves in a room to prevent him from kicking in the door. Also that year, while McIntyre was driving Minkey home from a party, he became verbally abusive, grabbed the steering wheel and jerked the car toward parked cars and houses, grabbed McIntyre's head, and pulled her by the hair. In early 2009, Minkey put McIntyre in a chokehold during an argument in the presence of their son. In August 2009 (subsequent to McIntyre's filing a petition for dissolution), she reported an incident to the police where Minkey grabbed their then-four-year-old son, slammed him on the ground, and verbally abused him for urinating on himself. The following month, McIntyre told police that she had locked herself and her children in a bedroom after Minkey kept opening the door during an argument and hit her in the leg.

Just prior to McIntyre's March 2011 DVRO request, Minkey was verbally abusive toward her in front of the children while on a trip together. In a separate incident,

Minkey yelled at their daughter, "got[] in her face," implied he might hit her, and when the girl protested said, "[W]hat are you going to do?" McIntyre left the home with the girl that night. On an unspecified date, Minkey grabbed their daughter by the jaw, slammed her against a kitchen cabinet, and yelled at her. The daughter submitted a letter corroborating incidents of abuse described by McIntyre and reporting additional incidents.

The court granted a temporary restraining order and set a hearing for April 2011. In opposition, Minkey disputed the accounts of abuse and argued that McIntyre had not alleged he committed or threatened to commit serious bodily harm. In April, the court (Judge Monica F. Wiley) entered a stipulated child custody and visitation order. The minute order of the April hearing also states that the court issued a one-year "non-CLETS restraining order"[2] protecting McIntyre from Minkey, although no such order is contained in the record. In June, the court entered a new stipulated support, custody and visitation order, which gave McIntyre exclusive use of the family home and required Minkey to stay away from the home. The court terminated the "non-CLETS restraining order" by "agreement."

McIntyre and Minkey later reported that they resumed an on-and-off relationship sometime after June 2011. McIntyre claimed their intimate relationship ended in September 2012, and Minkey claimed it ended in January 2013.

---

[2] CLETS is an acronym for the California Law Enforcement Telecommunications System, a computer system operated by the Department of Justice. (*People v. Martinez* (2000) 22 Cal.4th 106, 113; see Gov. Code, § 15151.) Restraining orders issued pursuant to the DVPA are required to be entered into CLETS to facilitate enforcement. (§ 6380.) We observe that some family law courts apparently issue "non-CLETS" restraining orders in lieu of DVRO's, perhaps with a view to mitigate in "close cases" the significant consequences that may accrue to the restrained spouse or partner. (See *Ritchie v. Konrad* (2004) 115 Cal.App.4th 1275, 1291 (*Ritchie*) [citing concerns about "social stigma" that might interfere with the restrained party's employment, social life, and "access to his (or her) children even when they are not potential targets of abuse"]; §§ 3044, 6389 [presumption against joint child custody; ban on firearm ownership or possession].) We have no occasion to consider here the validity of this nonstatutory response to a DVRO request.

3

B.  *2013 DVRO Proceedings*

On March 14, 2013, McIntyre again requested a DVRO, reporting that Minkey "comes to the house and lets himself in, in violation of our current order. . . . [¶] . . . [¶] . . . I have made it very clear to [Minkey] that I do not want to talk to him unless we need to speak about our children.  Still, he calls me three or four times per day. . . . [¶] . . . [He] also sends me approximately 20–30 text messages each day."

McIntyre averred Minkey entered the home in July 2012, and he became verbally abusive toward her in front of the children.  After he left, McIntyre chained the front door from the inside, but Minkey broke the chain open and texted her, "I'm warning you never to lock me out of my house or you will pay."  In February 2013, Minkey confronted McIntyre about phone records as she was trying to pick up the children and return home.  He would not let go of the car door until the parties' daughter pushed his hand off the door.  In a later phone call, Minkey verbally abused the girl.  After McIntyre changed her cell phone number, Minkey entered the home, found the phone, and forwarded texts from the phone to himself and back to McIntyre.  He also left a note for McIntyre on a personal item in her bedroom, and asked her about another personal item he had apparently found while searching the home.

On March 7, 2013, Minkey sent McIntyre 30 text messages between 12:07 a.m. and 9:04 p.m.  Some of those texts read: "I don't want to explode and lose my children or you, or damage Ruben [(apparently, McIntyre's boyfriend)] or anyone";  "Keep doing this to me and I'm going to snap and everyone loses!"; "This is too much.  I need help.  I'm going to lose it."  McIntyre replied five times, including, "Leave me alone . . . I don't ever want to hear from u again!"; and "Don't text [our daughter], my family or friends!"  Minkey entered the house that day and McIntyre told him to leave her alone.  Minkey followed McIntyre into another room, embraced and kissed her, and would not let go.  He said he would return in the morning.  McIntyre texted him, "Don't ever touch me!  Don't come to the house/morning."  Minkey entered the house the next morning, climbed on top of McIntyre in her bed, kissed her, refused her requests to get off, and pinned her down, bruising her arm.

4

The court (Judge Michael Isaku Begert) granted McIntyre a temporary restraining order and scheduled a hearing for April 2013, which was ultimately continued to July. In a response, Minkey wrote[3] that neither he nor McIntyre had fully respected the June 2011 visitation order. "[McIntyre] and I have both come and gone from the family home as we please, mutually caring for our children and maintaining the property. [¶] . . . During the fall and winter of 2012, I stayed in the family home with [McIntyre] and our children after I underwent double hip replacement surgery on November 30, 2012. [¶] . . . Although I maintained a separate residence, I continued to stay overnight and share a bed with [McIntyre] at our family home periodically through January 2013."[4] He disputed that McIntyre was fearful of him, noting that on March 11, 2013—shortly after the March 7 events recounted by McIntyre—he and McIntyre met for lunch, agreed on a modification of the visitation order, and agreed that Minkey would pay McIntyre's credit card debt. He told her that day he was going to the family home and she did not object. About a week later, Minkey gave McIntyre additional money she had requested and he hand-delivered the money at the family home with no objection from McIntyre.[5]

Minkey also argued the proposed DVRO would damage his professional reputation and impose an unfair burden on him because he needed to be able to communicate with McIntyre regarding the children and enter the house to retrieve items for himself or the children, to carry out maintenance and repair, and to protect the children if they were left alone at night, as they had been on repeated occasions. He argued later in court that a DVRO also would be a burden because he was applying to

---

[3] Minkey's "declaration" is not made under penalty of perjury, although it is incorporated by reference into his form response to the petition, which is verified under oath.

[4] McIntyre acknowledged that she "allowed [Minkey] to recuperate from his hip surgery in December 2012. However, we did not share a bed. . . . I made it known to [him] that his sexual advances were unwanted after September 2012 . . . ."

[5] Minkey also claimed that McIntyre frequently called and e-mailed him, but McIntyre averred that the phone calls were placed by her children and that she had not sent Minkey hundreds of texts, as Minkey had claimed.

volunteer for the Make-A-Wish Foundation and was traveling with Surfaid International to vaccinate children in poor countries. "[T]he restraining order has affected my ability to travel freely. It has affected my reputation."

The March 2013 temporary restraining order required Minkey to stay away from McIntyre, barred him from returning to the family home, and required him to pick up the children from school rather than the home. On April 10, the parties agreed to continue the DVRO hearing to April 24 "to work on stipulation." The temporary restraining order was reissued. Minkey and McIntyre stipulated that on nonschool days Minkey could pick up the children from the family home if he remained in the car and did not communicate with McIntyre. On April 24, the parties agreed to again continue the hearing to June 12, and the temporary restraining order was reissued with modifications. They agreed that Minkey could communicate with McIntyre by text or e-mail regarding the children, the home or their pets, and he could enter the home on specified days of the month for maintenance and repair.

In June 2013, McIntyre averred that Minkey repeatedly violated the April 24 temporary restraining order. On April 11, he attempted to enter the family home's garage. On April 13, 14, 16, 19, 23, and May 11, he entered the home without permission. He also texted and e-mailed McIntyre "incessantly" with messages that included repeated pleas for reconciliation; long, ranting criticisms of her conduct as a mother and wife; and verbal abuse, racial slurs and profanity. Some of the texts were: "you make me fucking sick, fuck you and fuck your ghetto boyfriend"; "go hang out with ur little punk spic mfr u ghetto ass losers!!!"; and "your piece of shit cheating mfn mexican who's day will come. and so will yours. karmas a bitch."

The June 12, 2013 hearing was rescheduled to give Minkey an opportunity to respond to McIntyre's supplemental declaration. The temporary restraining order was reissued. McIntyre filed a second supplemental declaration on July 11 alleging that Minkey committed "over 70" additional violations of the temporary restraining order in the month following her first supplemental declaration. Hearing on McIntyre's March 2013 DVRO request was finally held on July 17 and 24. The parties' daughter testified

6

that she had witnessed Minkey enter the family home without permission; try to hug McIntyre and be pushed away; verbally abuse McIntyre, calling her "a slut and a whore and a bitch"; and stand very close to McIntyre when he argued with her (although McIntyre did the same). Minkey admitted entering the house the day before the hearing because he noticed a gate was open.

During the hearing, Judge Begert made several comments noting Minkey's need for—and lack of—self-control. McIntyre's counsel argued, "[W]hile this temporary restraining order is in effect, one would assume [this] is [Minkey's] best behavior. He has a permanent restraining order request pending. [He] is represented by counsel during this time. [¶] . . . [But he] did not stop. He cannot control himself . . . ." Minkey's counsel argued, "This is a couple that has had an ongoing relationship that has been off and on for over a period of three years. [¶] . . . They reunited, and they separated again. [McIntyre] has requested that [Minkey] not contact her, . . . and then she . . . agrees to meet with him two to three days later after the initial 'Don't contact me.' There has been a lot of confusion. [¶] . . . [¶] . . . Since the restraining order has been issued, [Minkey] has greatly limited his contact to [McIntyre]. . . . [¶] . . . [¶] . . . Any confusion about the relationship has cleared up." Judge Begert ruled: "I am optimistic that if we can get some of these issues resolved [in the divorce case], it will deescalate matters, but I am sufficiently concerned right now particularly by the extensive electronic communications that have taken place since the temporary restraining order was issued and the substance of those communications that I am going to issue a restraining order." Judge Begert issued a DVRO that was scheduled to expire on April 24, 2014, and that essentially continued the terms of the April 24, 2013 stipulated order. He specifically advised that all contacts or communications between the parties had to be "brief and peaceful."

C.      *2014 DVRO Renewal Proceedings*

On April 23, 2014, one day before the 2013 DVRO was due to expire, McIntyre applied for a five-year renewal. She submitted evidence that Minkey repeatedly sent her texts and e-mails in violation of the 2013 DVRO, and that those communications continued despite her calls to police. The texts and e-mails included repeated criticisms

7

of McIntyre's conduct as a mother and wife, which were not brief or peaceful; expressions of sadness over their breakup; and some vulgarity. Minkey had called the 2013 DVRO a "fake 'order.' "

At a May 14, 2014 hearing on the renewal request before Judge Begert, Minkey acknowledged that he had sent the texts and e-mails quoted by McIntyre. When Minkey interjected a comment during argument, the court said, "[W]hen you start talking like this and you just accelerate and accelerate, all that establishes is that you have too much emotion to not stop . . . doing the stuff that you're doing. [¶] . . . [¶] . . . You need to channel your frustration someplace else."

McIntyre's counsel argued that McIntyre was genuinely and reasonably concerned about what would happen if the DVRO were not renewed. The court, however, responded by asking McIntyre directly, "Are you really?" She replied, "I am. Because I know, in my relationship with [Minkey], that he gets emotional. And when he's drinking, he will come to the house when I'm sleeping . . . I need a restraining order to protect the home and my family." The court questioned McIntyre's counsel about what abuse McIntyre feared. "You've got these text messages. Which one is it that she's afraid of . . . ?" Counsel cited a March 13 text that went "through a long story of guilting her, of saying how much he wants them to be able to . . . be there together. [¶] . . . [¶] . . . I think [that's] harassing conduct that's been enjoined by this Court . . . . [¶] There is also the fact that [she] fears he will come into their home without this restraining order, and she won't have anything to protect her. [¶] This has happened in the past." The court responded, "I can tell you the initial restraining order was not based on some concern that there be physical violence." The court commented on the "off-and-on relationship after two different restraining orders were in effect. [¶] So . . . I'm not really happy with the respect to which Mr. Minkey has afforded the restraining order that I issued in here. But it seems like these two individuals, neither one of them is really paying attention to these restraining orders. And so I am a little bit sympathetic that Mr. Minkey continues to have some ambiguity in his mind about how he's supposed to interact with Ms. McIntyre."

8

The court declined to renew the DVRO, saying "Mr. Minkey, I'm going to give you something to lose, and I'm going to guarantee you that you will lose it so fast that it will make your head spin. [¶] . . . [¶] . . . I'm not going to renew this thing. If you do anything, including the stupid stuff that you have been doing in this case while this restraining order was in effect, you can bet . . . that Ms. McIntyre will be back in here requesting a new restraining order, and she will get it. . . . [¶] . . . [¶] . . . [Y]ou're giving her an excuse to do this to you. So you don't have anybody to blame but yourself." Addressing McIntyre, the court stated, "Now, I do think that you deserve some protection. I am not going to renew this restraining order, but I would encourage you, if anything happens that would have been a violation of this restraining order, . . . come back in here, and I will give you a restraining order."[6] McIntyre appeals.

## II. DISCUSSION

The purpose of the DVPA is "to prevent acts of domestic violence, abuse, and sexual abuse and to provide for a separation of the persons involved in the domestic violence for a period sufficient to enable these persons to seek a resolution of the causes of the violence." (§ 6220.)[7] The DVPA authorizes the trial court to issue a restraining order "if an affidavit . . . shows, to the satisfaction of the court, reasonable proof of a past act or acts of abuse." (§ 6300.) For purposes of the DVPA, "abuse" means intentionally or recklessly causing or attempting to cause bodily injury; sexual assault; placing a person in reasonable apprehension of imminent serious bodily injury to that person or another; or engaging in behavior that could be enjoined pursuant to section 6320. (§ 6203.) Section 6320 covers not only "molesting, attacking, striking, stalking,

---

[6] McIntyre asks us to take judicial notice of a subsequent DVRO that Judge Begert issued in December 2014. We deny the request. As a general rule, when we review a trial court ruling we do not consider matters that occurred after the ruling and thus were not before the court at the time it made its decision. (*In re Zeth S.* (2003) 31 Cal.4th 396, 405.)

[7] Several statutes discussed in this opinion were amended effective January 1, 2015, after the trial court made the decision under review here. (See Stats. 2014, ch. 635, §§ 1–7.) Except where noted, the amendments are immaterial to this case.

9

threatening, sexually assaulting, [and] battering," but also "harassing, telephoning, . . . *contacting, either directly or indirectly, by mail or otherwise*, coming within a specified distance of, [and] *disturbing the peace of the other party . . . .*" (§ 6320, italics added.) The court may issue a restraining order after notice and a hearing for a period of up to five years. (§ 6345, subd. (a); *In re Marriage of Nadkarni* (2009) 173 Cal.App.4th 1483, 1494–1495.)

A DVRO "may be renewed, upon the request of a party, either for five years or permanently, without a showing of any further abuse . . . ." (§ 6345, subd. (a).) This does not mean that an order must be renewed "merely because the protected party files a 'request' and expresses [a] subjective desire the court issue such an extension." (*Ritchie, supra,* 115 Cal.App.4th at p. 1284.) In a contested case, the protected party must show an objectively " 'reasonable apprehension' " of future abuse if the order is allowed to expire. (*Id*. at p. 1288.) "That is, the court must find the probability of future abuse is sufficient that a reasonable woman (or man, if the protected party is a male) in the same circumstances would have a 'reasonable apprehension' such abuse will occur unless the court issues a protective order." (*Ibid*.) "[T]his does not mean the court must find it is more likely than not future abuse will occur if the protective order is not renewed. It only means the evidence demonstrates it is more probable than not there is a sufficient risk of future abuse to find the protected party's apprehension is genuine and reasonable." (*Id.* at p. 1290.) In assessing the risk of future abuse, the trial court "ordinarily should consider the evidence and findings on which [the] initial order was based," which "often will be enough in themselves to provide the necessary proof to satisfy that test." (*Id*. at pp. 1290–1291.) The court "should not permit the restrained party to challenge the truth of the evidence and findings underlying the initial order, . . . [which] would contradict principles of collateral estoppel . . . ." (*Id*. at p. 1290.) The court should also consider any significant change in circumstances that affects the risk that the abuse will recur, and the burdens that the DVRO imposes on the restrained party. Burdens are irrelevant if the feared abuse is physical violence, but may be relevant "where the existing order focuses not on the threat of physical violence, but lesser forms of abuse—unwanted telephone

10

calls or mail, for example. Where the worst 'danger' the protected party must fear is a few unwanted calls or letters or e-mail messages, the court may have to weigh the seriousness as well as the degree of the risk against the significance of the burdens. . . ." (*Id.* at p. 1292; see *Lister v. Bowen* (2013) 215 Cal.App.4th 319, 332–333.)

"The trial court's ruling on a request to renew a [DVRO] is reviewed for an abuse of discretion. [Citation.] An abuse of discretion occurs when the ruling exceeds the bounds of reason. [Citation.] But, the exercise of discretion is not unfettered in such cases. [Citation.] 'All exercises of discretion must be guided by applicable legal principles, however, which are derived from the statute under which discretion is conferred. [Citations.] If the court's decision is influenced by an erroneous understanding of applicable law or reflects an unawareness of the full scope of its discretion, the court has not properly exercised its discretion under the law. [Citation.] Therefore, a discretionary order based on an application of improper criteria or incorrect legal assumptions is not an exercise of informed discretion and is subject to reversal. [Citation.]' [Citation.] The question of whether a trial court applied the correct legal standard to an issue in exercising its discretion is a question of law [citation] requiring de novo review." (*Eneaji v. Ubboe* (2014) 229 Cal.App.4th 1457, 1463.)

When the court issued the 2013 DVRO, it necessarily found "reasonable proof of a past act or acts of abuse." (§ 6300.) In explaining its ruling, the court referred to "the extensive electronic communications that have taken place since the temporary restraining order was issued and the substance of those communications." The court also noted the level of emotion in Minkey's texts to McIntyre, and specifically advised him that his communications with McIntyre had to be "brief and peaceful." It appears reasonable to infer, therefore, that the "past act or acts of abuse" the court found to exist before it issued the 2013 DVRO were the emotional, lengthy and antagonizing texts and e-mails that Minkey had sent to McIntyre. Such conduct falls within the meaning of "abuse" in former section 6203, subdivision (d) (current § 6203, subd. (a)(4)) and section 6320, subdivision (a) because it constitutes "harassing, . . . contacting, either directly or indirectly, by mail or otherwise, . . . or disturbing the peace of the other party." (See

11

*Burquet v. Brumbaugh* (2014) 223 Cal.App.4th 1140, 1144 [unannounced and uninvited visit and repeated contacts by phone, e-mail, and text, despite requests of no contact, " 'disturb[ed] the peace' " and constituted " 'abuse' " within the meaning of § 6320]; *Nevarez v. Tonna* (2014) 227 Cal.App.4th 774, 776–780, 784.)

In 2014, McIntyre presented evidence that Minkey continued the same pattern of abuse after issuance of the 2013 DVRO. She quoted from texts and produced copies of e-mails containing emotional, lengthy and antagonizing criticisms of McIntyre's conduct as a mother and wife, expressions of sadness over their breakup, and some vulgarity. The court appeared to acknowledge the credibility of McIntyre's allegations, saying to Minkey, "[W]hy would you do this stuff?" and "[Y]ou still have trouble keeping a lid on it." The court, however, later seemed to focus on whether McIntyre had demonstrated a reasonable fear of *physical* abuse from Minkey. The court twice asked McIntyre's counsel, "[W]hat's the abuse that she has a reasonable apprehension of?" and when counsel referred to the texts and e-mails, stated, "No, no, no, no. Tell me something practical. What is it? . . . [¶] . . . [¶] . . . You've got these text messages. Which one is it that she's afraid of, and are you going to tell me that that constitutes abuse?" Counsel noted that the court had already found the texts and e-mails to constitute abuse, but the court replied, "I can tell you the initial restraining order was not based on some concern that there be physical violence." To the extent that the court required a showing of threatened physical abuse in order to renew the restraining order, the court erred.

"Abuse [within the meaning of the DVPA] is not limited to the actual infliction of physical injury or assault." (§ 6203, subd. (b), as amended by Stats. 2014, ch. 635, § 2; *Conness v. Satram* (2004) 122 Cal.App.4th 197, 202 ["the requisite abuse need not be actual infliction of physical injury or assault"; construing former § 6203, as amended by Stats. 1998, ch. 581, § 16].) As noted *ante*, several courts have upheld the issuance of DVRO's based largely on harassing communications. (See, e.g., *Burquet v. Brumbaugh, supra,* 223 Cal.App.4th at p. 1144.) The court's statement that it had not issued the 2013 DVRO "based on some concern that there be physical violence" seemed to at least implicitly recognize this authority. Inexplicably, however, the court suggested that

12

evidence of a credible threat of physical violence would be necessary to renew the order, even though renewal does not require "a showing of any further abuse since the issuance of the original order" (§ 6345, subd. (a)), much less a showing of further *physical* abuse.

The court agreed that Minkey had violated the terms of the restraining order, but commented that "neither one of them is really paying attention to these restraining orders" in an "off-and-on relationship." However, while the court referenced its familiarity with the family dynamics in the underlying dissolution proceeding, Minkey had earlier conceded that the couple's intimate relationship ended no later than January 2013, and at the 2014 hearing he introduced no evidence that McIntyre had initiated any contact with him outside the bounds of the 2013 DVRO during the pendency of that order. In any event, McIntyre's resumption of her relationship with Minkey in 2011–2012 was irrelevant. All restraining orders issued in this matter restrained *Minkey*, not McIntyre. As Judge Begert himself said during the 2013 proceedings, McIntyre's conduct toward Minkey was irrelevant because the "temporary restraining order . . . goes in one way," and Minkey was liable for violating the order "whether [the violation] is invited or not." The court possibly believed the absence of evidence of unwelcome physical contact between McIntyre and Minkey since June 2013 changed the reasonable apprehension calculus. However, "the fact that a protective order has proved effective is a good reason for seeking its renewal," not its termination. (*Ritchie, supra,* 115 Cal.App.4th at p. 1284.)

Part of the court's justification for refusing a renewal order was its view that Minkey "continues to have some ambiguity in his mind about how he's supposed to interact with Ms. McIntyre." But Minkey's counsel conceded during the 2013 proceedings that "[a]ny confusion about the relationship has cleared up." The court directly informed Minkey in 2013, "[*W*]*hether it is invited or not*, you can get in trouble if you are in violation of the order." (Italics added.) Moreover, the 2013 DVRO clearly recites that "[e]ven if the protected person invites or consents to contact with the restrained person, the orders remain in effect and must be enforced. . . . The orders can be changed only by another court order." There was no substantial evidence that would

13

support a finding that Minkey was reasonably confused about the requirements of the 2013 DVRO so as to excuse repeated violations.

The court previously found that Minkey committed abuse by sending emotional, lengthy and antagonizing texts and e-mails to McIntyre in the months leading up to issuance of the 2013 DVRO, that Minkey continued to send such e-mails thereafter, and that Minkey continued to show an inability to control himself and abide by the court's orders. It commented on "the stupid stuff that [Minkey has] been doing in this case while this restraining order was in effect."

The evidence, as accepted by the court, of Minkey's persistent conduct established a more than reasonable objective apprehension by McIntyre of future abuse if the DVRO were allowed to expire. There was no evidence that circumstances had changed such that "the restrained and protected parties [have] moved on with their lives so far that the opportunity and likelihood of future abuse has diminished to the degree they no longer support a renewal of the order." (*Ritchie, supra*, 115 Cal.App.4th at p. 1291.) In fact, quite the contrary.

Despite findings acknowledging Minkey's continuing abusive behavior, the court elected only to warn Minkey of the consequences of future violations. The trial court's "warning" comments to Minkey "suggest that the trial court believed there was a need to admonish [Minkey] from the bench that he must continue to stay away and have no contact with [McIntyre], but without giving [McIntyre] the legal protection of a restraining order." (*Cueto v. Dozier* (2015) 241 Cal.App.4th 550, 562–563 [abuse of discretion to deny restraining order where reasonable apprehension of future abuse shown].) The trial court's comments serve to further "bolster our conclusion that [McIntyre] had demonstrated a reasonable apprehension of future abuse." (*Id.* at p. 562.)

It was an abuse of discretion to deny renewal of the DVRO under these circumstances.

## III. DISPOSITION

The May 14, 2014 order denying McIntyre's request for a renewal of the 2013 DVRO is reversed. On remand, the court shall enter a renewal of the 2013 DVRO

14

for the requested five-year term.  McIntyre is awarded her requested costs and fees on appeal pursuant to section 6344, subdivision (a).


                                                  _____

                                                  BRUINIERS, J.


WE CONCUR:


_____

JONES, P. J.


_____

NEEDHAM, J.