Filed 1/13/22  Jane v. Morning CA6
**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| PAULINA JANE,<br><br>    Plaintiff and Appellant,<br><br>v.<br><br>WILLIAM CHARLES MORNING,<br><br>    Defendant and Respondent. | H047214<br>(Santa Clara County<br>Super. Ct. No. 17DV000696) |

Appellant Paulina Jane appeals from an order denying her request to renew a restraining order under the Domestic Violence Prevention Act (DVPA) (Fam. Code, § 6200 et seq.).[1]  Jane contends the trial court failed to apply the correct standard in analyzing whether she met her burden to obtain a renewal of the restraining order against respondent William Charles Morning, with whom Jane previously had a dating relationship.  Because we conclude the trial court applied the correct standard, we affirm the order.

---

[1] Unspecified statutory references are to the Family Code.

## I. FACTS AND PROCEDURAL BACKGROUND[2]

The parties met in December 2016, when Morning responded to Jane's advertisement listing a room for rent in her residence. Morning signed a six-month lease and moved into the room. Shortly thereafter, Morning and Jane became romantically involved. The dating relationship lasted about three months. According to Jane, Morning prematurely vacated the residence without notice, and despite later providing assurances that he would honor the lease, failed to do so. Jane ultimately filed a small claims lawsuit in May 2017 to recover from Morning the rent owed and the cost of items she alleged he had taken.

In September 2017, after certain encounters with Morning (described in more detail below), Jane filed in family court a request for a domestic violence restraining order. The trial court held a trial on the restraining order request and, on February 6, 2018, granted Jane a one-year restraining order that would expire on February 6, 2019.

On February 1, 2019, Jane filed a request to renew the restraining order prior to its expiration (renewal request). In support of her request, Jane stated that she feared future abuse due to a pending civil case she had filed against Morning. The renewal request asserted that "[i]n the event the restraining order expires while the civil case remains open, [Jane] fears that Mr. Morning will begin harassing and threatening [Jane]'s safety." The trial court extended the original restraining order, pending the hearing on the renewal request, which was continued to June 2019.

On June 12, 2019, Jane, who was represented by counsel, and Morning, who was self-represented, appeared for a hearing on the renewal request. Jane testified that she feared future harm, if the restraining order were not renewed, based on the history of

---

[2] The facts and procedural background are taken from the limited record on appeal, consisting of the request to renew restraining order, filed by Jane in February 2019, the trial court's June 12, 2019 minute order denying the renewal request, and the reporter's transcript from the June 12 hearing on the renewal request, in which Jane appeared as the sole witness.

2

Morning's threats against her. Jane stated that Morning had filed a civil lawsuit against her "just to harass[]" her. Jane asserted that Morning "owns multiple guns" and, though he was aware he had to turn in his firearm under the original restraining order, did not turn it in until the judge later "ordered him to do so." Jane stated that because she was an immigrant and lived alone, without any family nearby, and because Morning had access to guns through both his domestic partner and uncle, she was "very afraid" that without the protection of the renewed restraining order, she would not be able to complete her ongoing civil fraud case against him because "he could just do something to me." Jane testified that Morning told her "many time[s]" that if she died, "nobody would know."

Jane also testified regarding the prior conduct that provided the basis for the original, one-year restraining order against Morning. She described her communications with him during what he had led her to believe was a temporary absence from the residence in March 2017, before the end of the six-month lease term. When she checked his room and found it empty, she felt "totally fooled. So [she] drove in the very late night to Placerville, because [she] called him and he didn't want to respond." Jane wanted "to see if we can come out and meet and talk about [the] relationship and [her] money." When she told him she was on her way to his residence, he told her, " 'If you dare come to my house, Tammy' – that's, his domestic partner," would kill her. So Morning instead met Jane at a shopping center near his home and assured her he was "not dumping" her.

Jane further testified that although Morning "start[ed] playing game[s] again" by claiming he didn't have enough money, Jane did not take legal action right away. Because Jane did not believe that Tammy was going to kill her, she spoke to Tammy and learned from Tammy about Morning's pattern of infidelity with women in the Bay Area. Jane filed her small claims action in May.

On June 30, 2017, at the first hearing on her small claims lawsuit, Morning requested a continuance to file a countersuit, then approached Jane outside the courtroom and suggested they try to settle the dispute. Although they were in San Jose, Morning

3

said he could take Jane to Pacifica to talk about the settlement. She insisted they stay close by, and they went to the nearby Fairmont Hotel restaurant. While seated at the restaurant, Morning made sexual advances, tried to hug and kiss Jane, and also reached underneath her skirt and tried to put his fingers inside her panties. Jane pushed him away and told him loudly to stop, but then agreed to stay and talk about the settlement because she "really want[ed] a settlement too" and "want[ed] it to be over and [not] have to see him anymore." Jane testified that they reached an agreement whereby Morning would pay what he owed in rent if she agreed to waive penalty and interest. However, when she asked to put the agreement in writing, he told her " 'Lady, that's not that easy, unless you go to Pacifica to spend a long weekend with me. And – and we're going to fuck around for whole three night[s], otherwise I'm not going to sign the settlement.' "

Jane testified that she was very angry and refused to go to Pacifica. Jane stated that in response, Morning handed her a fabricated time sheet of work he had purportedly performed for her on her rental properties and threatened she was going to be in trouble if she did not drop her claim against him. When Jane replied that she was going to talk to Tammy again, Morning told her that he would sue her and that she could "get [herself] killed." She left the restaurant and went home, but Morning was waiting outside her house. He repeated his proposition to spend the weekend in Pacifica in exchange for settling the lawsuit and paying her back. Although Jane thought his behavior was outrageous, she did not think it was serious, so she sent Morning a text message afterward, letting him know that "this is sexual harassment" and that at their September small claims hearing, she would tell the judge about it. Morning did not respond. Jane later "got really scared" when the process server called and she learned that Morning had sued her based on the "fake invoice." At that point, she thought, "my life probably will be in danger because he will put his threat into action." So Jane went to the police to document the sexual harassment and threats.

4

At the time of the hearing on her restraining order renewal request, Jane testified that the small claims case and Morning's lawsuit against her had both been resolved, following appeals. However, she filed a civil lawsuit against Morning based on the fraud he perpetrated against her by pretending to be her boyfriend and working together with her but then fabricating a time sheet, and that lawsuit was still pending. Jane explained that she had to get counseling for the turmoil she experienced from Morning—as her ex-boyfriend—threatening her, lying, and defrauding her for money. She was "still very afraid" of him.

Following the testimony, the trial court clarified that since the incidents in June 2017 at the Fairmont Hotel restaurant and in front of Jane's house, Morning had not made any inappropriate contact with Jane. Jane confirmed that all contact had been through her lawyer but asserted that was "because [of] the restraining order."

The trial court indicated it would deny Jane's renewal request. The court explained that based on the facts presented, which showed that the original, one-year restraining order had been granted based on the allegations of inappropriate sexual conduct and unwanted touching that took place at the Fairmont Hotel restaurant in June 2017, the court could not find beyond a preponderance of the evidence that there was a reasonable apprehension of future harm if the restraining order were not renewed.

Jane's counsel argued in response that the absence of contact did not signify a lack of reasonable apprehension of future harm; rather, it was "the restraining order doing its job." Her counsel emphasized that the apprehension of future harm was not only due to the sexual harassment in June 2017 but to the threats that Jane could be killed, whether by Morning or somebody he knew, and that those threats, as well as the fraudulent countersuit, were "all triggered because [Jane] had filed a small claims lost rent action against him." Counsel pointed out that because there was now an ongoing civil case with higher stakes, and given the fact that Morning knew where Jane resided and might have access to firearms, Jane's fear that she could be hurt was reasonable.

5

Following the arguments of the parties, the trial court repeated its decision to deny the renewal of the restraining order. Jane timely filed an appeal from the denial of her renewal request.[3]

## II. DISCUSSION

The sole question on appeal is whether the trial court failed to apply the correct standard in analyzing Jane's renewal request. Jane contends that while the trial court articulated the correct standard, it misapplied that standard in determining whether to renew the restraining order. Jane argues that in considering whether she met her burden to renew the restraining order, the trial court placed too much weight on the lack of any violation of the restraining order during the period it had been in effect.

Morning, who represented himself at the hearing on the renewal request, has not participated in this appeal. We therefore decide the appeal based on the record and the opening brief. (Cal. Rules of Court, rule 8.220(a)(2).)

*A. Statutory Scheme and Standard of Review*

The purpose of the DVPA "is to prevent acts of domestic violence, abuse, and sexual abuse and to provide for a separation of the persons involved in the domestic violence for a period sufficient to enable these persons to seek a resolution of the causes of the violence." (§ 6220.) Under its provisions, the trial court "may issue an order 'to restrain any person for the purpose of preventing a recurrence of domestic violence and ensuring a period of separation of the persons involved' upon 'reasonable proof of a past act or acts of abuse.' " (*Nevarez v. Tonna* (2014) 227 Cal.App.4th 774, 782; see § 6300; accord *Rodriguez v. Menjivar* (2015) 243 Cal.App.4th 816, 820 (*Rodriguez*).)

---

[3] The denial of Jane's request to renew the restraining order is appealable as an order refusing to grant an injunction under Code of Civil Procedure section 904.1, subdivision (a)(6). (See *Molinaro v. Molinaro* (2019) 33 Cal.App.5th 824, 831, fn. 6 [appeal from issuance of restraining order]; *Nakamura v. Parker* (2007) 156 Cal.App.4th 327, 332 [appeal from denial of application for temporary restraining order].)

The DVPA broadly defines abuse to include conduct that puts a person "in reasonable apprehension of imminent serious bodily injury," (§ 6203, subd. (a)(3)) or any other behavior that may be enjoined under the statute (*id.*, subd. (a)(4)), including threatening, sexually assaulting, or "disturbing the peace of the other party" (§ 6320, subd. (a)) by conduct that, under the totality of the circumstances, "destroys [their] mental or emotional calm." (*Id.*, subd. (c); see *Rodriguez*, *supra*, 243 Cal.App.4th at p. 820.) A restraining order under the DVPA may be based on a showing of "reasonable proof of a past act or acts of abuse" (§ 6300, subd. (a)) and may be renewed "without a showing of further abuse since the issuance of the original order." (§ 6345, subd. (a).)

Courts have interpreted the standard for restraining order renewal in a contested case as requiring an objective showing that the protected party entertains a " ' "reasonable apprehension" ' " of future abusive conduct. (*Eneaji v. Ubboe* (2014) 229 Cal.App.4th 1457, 1463 (*Eneaji*), citing *Ritchie v. Konrad* (2004) 115 Cal.App.4th 1275, 1279 (*Ritchie*); see also *Lister v. Bowen* (2013) 215 Cal.App.4th 319, 332–333 (*Lister*).) Under this standard, a request to renew a restraining order may not rest solely on the requesting party's "subjective fear the party to be restrained will commit abusive acts in the future.' " (*Ritchie*, at p. 1288.) Instead, "[a] trial court should renew the protective order, if, and only if, it finds by a preponderance of the evidence that the protected party entertains a 'reasonable apprehension' of future abuse." (*Id.* at p. 1290.) In making this determination, the trial court decides whether "the evidence demonstrates it is more probable than not there is a sufficient risk of future abuse to find the protected party's apprehension is genuine and reasonable." (*Ibid.*)

The standard of review for an order granting or denying injunctive relief, including the trial court's ruling on a request to renew a domestic violence prevention restraining order, is abuse of discretion. (*Eneaji*, *supra*, 229 Cal.App.4th at p. 1463; see *Rodriguez*, *supra*, 243 Cal.App.4th at p. 820; *Salazar v. Eastin* (1995) 9 Cal.4th 836, 850 [stating rule that orders to grant or deny " ' "a permanent or preliminary injunction rest[]

7

in the sound discretion of the trial court upon a consideration of all the particular circumstances of each individual case" ' "].)

Because every exercise of discretion must be guided by applicable legal principles, which are derived from the statute under which discretion is conferred, " 'a discretionary order based on an application of improper criteria or incorrect legal assumptions is not an exercise of informed discretion and is subject to reversal.' " (*Eneaji*, *supra*, 229 Cal.App.4th at p. 1463.)  Whether the trial court applied the correct legal standard in exercising its discretion to decide the underlying issue is a question of law subject to de novo review.  (*Ibid.*)

B.  *The Trial Court Applied the Correct Standard in Assessing the Renewal Request*

Jane contends that in analyzing the request to renew the restraining order, the trial court incorrectly placed too much emphasis on whether Morning had violated the restraining order during the period it had been in effect, when in fact the pertinent issue was the reasonableness of Jane's apprehension of future abusive conduct.  To assess Jane's contention, we consider both the standard for renewal and the trial court's application of that standard here.

First, regarding the standard, it appears from the record that the trial court articulated the correct standard for renewal of a domestic violence restraining order according to statutory and case authority.  At the outset of the hearing, the court explained to the parties that the burden was with the petitioner, Jane, to "prove beyond a preponderance of the evidence . . . that there is a reasonable apprehension of future harm if the restraining order is not renewed."  The trial court reiterated the applicable standard in considering the arguments of the parties at the end of the hearing.  The court's articulation of the standard is consistent with appellate case authority as set forth in cases like *Ritchie*, *Lister*, and *Eneaji*.

8

In *Ritchie*, the court analyzed as an issue of first impression the statutory standard for renewal, as set forth in section 6345. (*Ritchie*, *supra*, 115 Cal.App.4th at pp. 1283–1285.) The court reasoned that in cases where the restrained party (here, Morning) contests the requested renewal of the domestic violence restraining order, the protected party (here, Jane) "is not entitled to a renewal merely because she (or he) desires one. Section 6345 does not provide the trial court *shall* automatically renew the existing protective order if the protected party *requests*. By its terms, section 6345 only states the trial court *may* do so in the proper exercise of its discretion." (*Id.* at p. 1284.) On the other hand, the *Ritchie* court recognized that the statute expressly "makes it unnecessary for the protected party to introduce or the court to consider actual acts of abuse the restrained party committed after the original order went into effect." (*Ibid.*) After further considering the statutory purpose and legislative history of section 6345, the court arrived at the standard requiring an objectively " 'reasonable apprehension' of future abuse" (*Ritchie*, at p. 1290), summarized *ante* (part II.A.) and cited by the trial court here. Jane does not suggest the trial court identified an incorrect, governing legal standard. We therefore turn to the second part of our analysis and independently review the trial court's application of the legal standard to the facts of this case.

Jane emphasizes that by its express terms, section 6345 authorizes the trial court to renew a domestic violence restraining order "without a showing of further abuse since the issuance of the original order." (§ 6345, subd. (a).) Yet the trial court in this case directed its attention at several points during the hearing on the renewal request toward the question of whether there had been further inappropriate contact or abusive conduct following the June 2017 incidents. Indeed, the trial court observed, in reaching its conclusion that Jane had not met her burden by a preponderance of the evidence of showing a reasonable apprehension of future harm, that "[t]he evidence is undisputed that there's been no contact, no violations since June of 2017." Jane argues, based on this record, that the trial court erroneously founded its decision on the absence of restraining

9

order violations instead of considering Jane's evidence showing that it was reasonable for her to remain fearful given the prior pattern of abusive conduct by Morning and the pendency of her civil case against him.

We agree that, without more, the trial court's repeated inquiries into any additional instances of abusive contact after June 2017 might support an inference that the court's analysis of the evidence centered improperly on "further abuse" (cf. § 6345, subd. (a)), in contravention of the statute. However, our independent review of the record supports a conclusion that the court applied the correct legal standard by considering not only whether Morning engaged in any abusive conduct after June 2017 (especially considering Jane did not file for a restraining order until more than two months later, in September 2017), but also Jane's detailed testimony regarding the facts leading to the original restraining order and the basis for her continuing fear of Morning.

Courts may consider a variety of factors in evaluating whether the party requesting renewal of the restraining order has shown a reasonable apprehension of future abusive conduct. "[A]n imminent and present danger of abuse is not required." (*Lister*, *supra*, 215 Cal.App.4th at p. 332, citing *Ritchie*, *supra*, 115 Cal.App.4th at p. 1288.) But in weighing the risk of future abuse, the trial court may consider the evidence and findings that gave rise to the original restraining order. (*Eneaji*, *supra*, 229 Cal.App.4th at p. 1463; see *Ritchie*, at p. 1290.) The trial court should also consider the possible impact of changes in the parties' circumstances since the granting of the initial protective order. (*Ritchie*, at p. 1291.) Specifically, the court should evaluate whether the parties have "moved on with their lives so far that the opportunity and likelihood of future abuse has diminished to the degree they no longer support a renewal of the order? Or have there been no significant changes or even perhaps changes that enhance the opportunity and possibility of future abuse?" (*Ibid.*)

Here, the trial court heard testimony on each of these factors. Prior to Jane's examination by her counsel, the trial court asked Jane to explain why the restraining

10

order should be renewed, and specifically, "What apprehension of future harm do you have if, in fact, this order is not renewed?" Over several pages of reporter's transcript, Jane described the reasons she remained fearful. Jane asserted that Morning had threatened her multiple times, had filed a harassing lawsuit to defraud her, had delayed turning in his firearm and lied about having access to other firearms, had physically harassed and stalked her, and had threatened to get her killed if she did not drop her small claims case against him. Jane also testified in detail during her direct examination about the facts underlying the original restraining order. The court acknowledged Jane's testimony and asked clarifying questions, not only about whether she had experienced any further abuse after June 2017 but also about the status of the small claims lawsuit and her civil lawsuit against Morning. Furthermore, Jane's counsel emphasized in argument to the court the relevance of the pending lawsuit with "higher stakes at play" as a changed circumstance that heightened her apprehension of future abuse.

There is no indication in the record, express or implied, to suggest that the trial court disregarded the expansive range of testimony or failed to fairly consider the factors relevant to Jane's apprehension of future abuse. To the contrary, the trial court evaluated both the factual predicate for Jane's initial restraining order and the basis for her continuing apprehension. "[T]he mere existence of a protective order, typically issued several years earlier, seldom if ever will provide *conclusive* evidence the requesting party entertains a 'reasonable apprehension' of future abuse of any kind should that order expire. But the existence of the initial order certainly is relevant and the underlying findings and facts supporting that order often will be enough in themselves to provide the necessary proof to satisfy that test." (*Ritchie*, *supra*, 115 Cal.App.4th at p. 1291.)

On this record, the trial court's interest in the absence of any unwanted contact or abusive incidents after June 2017 was relevant to the renewal of the restraining order because it assisted the trial court in evaluating what transpired between July 2017 and Jane's filing of the initial restraining order in September 2017 and in weighing the

11

likelihood that such abuse would rekindle in the absence of renewal. Given the trial court's correct articulation of the legal standard and consideration of the factors outlined above, we conclude the court applied the correct legal standard in exercising its discretion to decide that Jane had not demonstrated, beyond a preponderance of the evidence, apprehension of future harm sufficient to justify imposition of a renewed restraining order. In addition, we perceive no abuse of discretion in the trial court's decision not to renew the order.[4]

### III. DISPOSITION

The June 12, 2019 order denying the restraining order renewal request is affirmed.

---

[4] Jane does not challenge the trial court's exercise of discretion in relation to the factual record but asserts only that the trial court misapplied the standard for renewal of a domestic violence restraining order. Nevertheless, to the extent the appellant appears to suggest there was an abuse of discretion by the trial court placing excessive emphasis on the issue of interim contact (after imposition of the original restraining order), we apply the deferential abuse of discretion standard. (*Eneaji*, *supra*, 229 Cal.App.4th at p. 1463.) Under that standard, the reviewing court will reverse only upon a showing that the trial court's ruling "exceed[ed] the bounds of reason." (*Ibid.*) Jane does not demonstrate any such abuse of discretion here. The record of the hearing on the renewal request reveals that Jane feared Morning would retaliate against her for her civil suit and believed he had the capacity and ability to carry out his earlier threats. Yet it is apparent from the evidence adduced that reasonable minds could differ as to the reasonableness of Jane's apprehension of future abusive conduct, especially considering her testimony that she began to take his conduct in July 2017 seriously only after he filed an allegedly fraudulent and retaliatory lawsuit against her. From this, the trial court may have reasonably inferred that Jane's anticipation of future abuse was more closely bound up with the stressful slew of litigation that followed her small claims suit than his threats and conduct in June 2017. " ' "When two or more inferences can reasonably be deduced from the facts, the reviewing court has no authority to substitute its decision for that of the trial court." ' " (*Lister*, *supra*, 215 Cal.App.4th at p. 333.) Absent a showing by Jane that the trial court abused its discretion in interpreting the evidence before it, we conclude the order denying the renewal request must be upheld.

_____

Danner, Acting P.J.

WE CONCUR:

_____

Lie, J.

_____

Wilson, J.

**H047214**
***Jane v. Morning***