Filed 3/14/25  P. v. Zamarron CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>CARLOS FRANCISCO ZAMARRON,<br><br>    Defendant and Appellant. | G062988<br><br>(Super. Ct. No. 96NF0252)<br><br>O P I N I O N |

Appeal from a postjudgment order of the Superior Court of Orange County, Andre Manssourian, Judge. Affirmed.

Jan B. Norman, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Christopher P. Beesley and Kristen Kinnaird Chenelia, Deputy Attorneys General, for Plaintiff and Respondent.

\*       \*       \*

Carlos Francisco Zamarron appeals from the order denying his petition for resentencing under Penal Code[1] section 1172.6.  He contends the order must be reversed because the prosecution failed to satisfy its burden of proving he was guilty of aiding and abetting an attempted murder beyond a reasonable doubt.

We reject the argument. Our earlier opinion, which affirmed Zamarron's conviction, established that the trial record contained substantial evidence to support the conclusion Zamarron aided and abetted the attempted murder. This evidence convinced the trial court of his guilt beyond a reasonable doubt.

Nor are we persuaded by Zamarron's contention that the elimination of gang evidence precluded the prosecution from establishing that he willingly aided and abetted the attempted murder. The prosecution was not required to establish Zamarron's motive for his participation in the attempted murder.

Zamarron also argues the order must be reversed because the trial court failed to specifically address the issue of his youth. We likewise reject that argument.

---

[1]  All further statutory references are to this code.

FACTS

As Zamarron acknowledges in his opening brief, trial testimony demonstrated that on December 29, 1995, at approximately 2:00 a.m., the victim arrived home after a night out. He was opening the door of his truck in the alley next to his home when he saw an El Camino approaching him with its lights off. As the car passed him, the victim recognized Zamarron sitting inside; he did not recognize either the driver or the third person in the car.

The El Camino parked behind the victim's truck; when the driver got out of the El Camino, the victim picked up a steering wheel locking device to use for potential defense. As the victim started to walk away, he was hit on the back. When he turned around, he saw a man with a gun, who told the victim several times that he was going to die.

The man with the gun then shot the victim; as the victim moved toward the shooter, he was shot again in the stomach. The victim then struck the shooter in the face, causing him to fall and drop the gun, which the victim kicked away. Zamarron, who by that time had also gotten out of the car, picked up the gun while the victim ran toward the shooter.

Zamarron, who was about 10 feet from the two men, pointed the gun at the victim, who by that time was holding the shooter in front of him as a shield. Zamarron said nothing. The victim told Zamarron to shoot, but he did not. The shooter elbowed the victim in the stomach, causing the victim to fall to the ground. The shooter struggled with Zamarron for possession of the gun.

The victim, who was trying to get up, then heard two more shots, both of which struck him although he did not immediately feel either. When the victim looked up, the original shooter had possession of the gun.

The victim's sister entered the alley and began screaming. She said the police were on the way. The shooter pointed the gun at her and apparently tried to shoot her, but the gun made a clicking noise. Zamarron, who was standing next to the shooter, yelled "let's go, let's go." After the two men got into the car, they drove away.

The prosecution presented expert gang testimony from a police detective who testified that when a gang member shoots on behalf of the gang, the shooter will be backed up by another gang member for protection. The detective identified the alley where the victim was shot as a gang area. The detective testified that, when he interviewed the victim in the hospital, the victim told him that after Zamarron picked up the gun, he pointed it at the victim. The victim never indicated Zamarron was trying to take the gun away from the shooter or assist the victim.

Zamarron was convicted of attempted murder on the theory he aided and abetted the shooter; we affirmed his conviction. (*People v. Zamarron* (Oct. 26, 1999, G022566) [nonpub. opn.] (*Zamarron I*).) Our opinion noted Zamarron was not the shooter but rejected his assertion that the evidence was insufficient to support the jury's finding he was culpable as an aider and abettor.

In January 2022, Zamarron petitioned for resentencing pursuant to former section 1170.95 (now § 1172.6), arguing he could not be convicted of attempted murder under current law. The District Attorney filed a response to the petition and agreed that an evidentiary hearing was appropriate because the jury at Zamarron's trial had not been instructed that Zamarron had to personally harbor the specific intent to kill. The District Attorney took the position that such a finding would be established by the evidence and record presented at the evidentiary hearing.

4

The trial court issued an order to show cause, and later conducted the hearing at which the District Attorney offered as its evidence the transcript of Zamarron's trial and our opinion affirming his conviction.

Zamarron presented new evidence at the hearing, which included his own testimony.[2] The new evidence also included testimony from the victim, the victim's sister, an expert on adolescent development, and Zamarron's trial counsel.

The testimony of the victim and his sister was inconsistent with their trial testimony. Both now remembered Zamarron yelling at the shooter to stop—several times, according to the sister—during the incident. At the trial, the victim testified Zamarron said nothing, even as he pointed the gun at the victim and struggled with the shooter for possession of the gun. The sister testified at trial that Zamarron said "let's go" after she appeared and said the police were on their way.

The victim also testified at the hearing, for the first time, that he had a brief conversation with the shooter before he was shot. He testified after the shooter told him he was going to die, he responded: "'Hey what do you want? Is it money you want?'" "'If you want money, there's money here in my wallet. But don't do that. . . . I mean why are you going to kill me? I don't even know you, have nothing against you. So if it's money that you want, it's right there. But leave me alone.'" The shooter responded, "'I'm sorry, but I was paid to do this.'" He then shot the victim.

According to the victim, he learned from a female friend in 2003 that her boyfriend had paid somebody to kill him. The victim never reported

_____

[2] Zamarron did not testify at his trial.

5

that information to prosecutors, and he never learned the identity of the shooter.

Zamarron testified at the hearing that he did not know the shooter, whom he first encountered that same night, when the shooter came to his house to buy drugs. Zamarron did not have the "eight ball" of methamphetamine the shooter was looking for, so Zamarron told him he would have to drive Zamarron "around the corner" to get it.

Zamarron then entered the shooter's car, and they drove around the corner to the street where Zamarron's drug connection lived; the victim lived across the street. According to Zamarron, after he bought the drugs from his connection, they "proceeded to drive into [the] alley," which also led back to Zamarron's home.

As they drove down the alley, Zamarron saw the victim standing nearby. The shooter pulled over and got out of the car. Shortly after that— Zamarron estimated a couple of seconds—he heard two shots fired. Zamarron got out of the car and noticed the shooter and the victim were struggling with each other. Zamarron did not immediately react. But when he saw the gun fall to the ground, Zamarron picked it up and pointed it at "both of them."

The victim told Zamarron to shoot, but Zamarron did not want to shoot anyone. The shooter got loose from the victim and came toward Zamarron. The shooter told Zamarron, in Spanish, to give him the gun; Zamarron responded, also in Spanish, "that's it," or "stop."

Zamarron said the two struggled for the gun, but the shooter got possession of it, and he began shooting again. Zamarron then "ran the opposite way." Zamarron denied having any knowledge that the shooter had a gun until after he fired the first shots at the victim. He also denied ever

seeing the shooter before that night, although he indicated that he had previously seen the shooter's car.

Zamarron admitted he got back into the shooter's car. When asked on cross-examination why he got back into the car with a stranger who had just shot someone, Zamarron stated, "I had no idea that he was going to shoot somebody. The person wanted to buy dope. I took him to buy the dope. I didn't know he was going to shoot him." When asked about his failure to help the victim, "who was bleeding on the ground," Zamarron said, "I tried to help him. I tried to stop it."

At the conclusion of the hearing, the court took the matter under submission. On August 14, 2023, the court issued an order denying the petition. The court's ruling stated it "finds beyond a reasonable doubt [Zamarron] acted as an aider and abettor during the attempted murder of [the victim]. Court has not taken any gang evidence, affiliation, or membership into consideration against [Zamarron] in the course of the Order to Show Cause proceeding."

## DISCUSSION

### I.

#### RESENTENCING LAW

Senate Bill No. 1437 (2017-2018 Reg. Sess.) (Stats. 2018, ch. 1015) (Senate Bill 1437), amended the felony-murder rule and eliminated the natural and probable consequences doctrine as a means of proving murder. Specifically, Penal Code section 189, subdivision (e), provides that in cases where a death occurs during the perpetration or attempted perpetration of a felony listed in section 189, subdivision (a), the defendant is liable for murder only if the person was the actual killer, the person acted with intent to kill in aiding, assisting or soliciting the killer, or if the person

7

"was a major participant in the underlying felony and acted with reckless indifference to human life, as described in subdivision (d) of Section 190.2." (*Id.,* subd. (e)(3).)

Additionally, Senate Bill 1437 provided a remedy for persons previously convicted of felony murder or murder under a natural and probable consequences theory. Section 1172.6 permits an individual to petition the sentencing court to vacate the conviction and be resentenced on any remaining counts if he or she could not have been convicted of murder or attempted murder because of changes to section 188 or 189. Section 1172.6, subdivision (b)(1), provides a petition for relief must include: "(A) A declaration by the petitioner that the petitioner is eligible for relief under this section, based on all the requirements of subdivision (a). [¶] (B) The superior court case number and year of the petitioner's conviction. [¶] (C) Whether the petitioner requests the appointment of counsel." (*Id.*, subd. (b)(1)(A-C).)

In cases where the petition contains all the required information, section 1172.6 requires the court to determine if an order to show cause should issue: "If the petitioner makes a prima facie showing that the petitioner is entitled to relief, the court shall issue an order to show cause." (*Id.,* subd. (c).)

If an order to show cause issues, "the court shall hold a hearing to determine whether to vacate the murder [or] attempted murder . . . conviction and to recall the sentence . . . ." (§ 1172.6, subd. (d)(1).)

"At the hearing to determine whether the petitioner is entitled to relief, the burden of proof shall be on the prosecution to prove, beyond a reasonable doubt, that the petitioner is guilty of murder or attempted murder under California law as amended by the changes to Section 188 or 189 made effective January 1, 2019. . . . If the prosecution fails to sustain its burden of

8

proof, the prior conviction, and any allegations and enhancements attached to the conviction, shall be vacated and the petitioner shall be resentenced on the remaining charges." (§ 1172.6, subd. (d)(3).)

## II.

### SUFFICIENCY OF THE EVIDENCE

Zamarron argues the prosecution "failed to satisfy their burden of proving [his guilt] beyond a reasonable doubt." His more precise assertion is that the new evidence he presented at the hearing "rebutted" the evidence from his original trial, which was also part of the record considered by the court in deciding his motion.

But the new evidence could only rebut the original trial evidence if the court found it credible. "A trier of fact is free to disbelieve a witness, even one uncontradicted, if there is any rational ground for doing so." (*In re Jessica C.* (2001) 93 Cal.App.4th 1027, 1043.) Accordingly, "the trier of the facts is not required to believe everything that a witness says even if uncontradicted." (*Guerra v. Balestrieri* (1954) 127 Cal.App.2d 511, 515.) Once the trier of fact has made a credibility determination, we generally do not review it. (*Nevarez v. Tonna* (2014) 227 Cal.App.4th 774, 786; see *Consolidated Irrigation Dist. v. City of Selma* (2012) 204 Cal.App.4th 187, 201 ["trial court's credibility findings cannot be reversed on appeal unless the testimony is incredible on its face or inherently improbable"].) Here the court did not find the evidence offered by Zamarron credible.

In *Zamarron I*, this court stated that "[t]o convict Zamarron of attempted murder on the theory he aided and abetted the gunman in commission of that crime, 'the jury had to find that he acted with (1) knowledge of [the gunman's] criminal purpose, and (2) the intent to encourage or facilitate that purpose.' [Citation.] 'Among the factors which

9

may be considered in making the determination of aiding and abetting are: presence at the scene of the crime, companionship, and conduct before and after the offense. [Citation.]' [Citations.] [¶] Here, each of these factors supports the jury's verdict. Zamarron was not only present at the scene, he arrived there in the gunman's El Camino which had been trolling [the victim's] alleyway at 2 a.m. with its headlights off—which is itself some evidence that something nefarious was in the works. He took part, or at least stood idly by, while [the victim] was hit from behind and, while he was not the one to fire the shots, he grabbed the gun after it was kicked from the driver's hands, pointed it toward [the victim] at his confederate's behest, and then returned the gun to the shooter. One last attempt was made to finish off the indomitable [victim], and then Zamarron left with his cohorts. Given these facts, the argument alleging evidentiary insufficiency borders on the frivolous." (*Zamarron I*, *supra*, G022566.)

That determination having been made as a matter of law in the prior appeal, Zamarron is precluded from raising the issue again. (*People v. Boyer* (2006) 38 Cal.4th 412, 441 ["the law-of-the-case doctrine 'prevents the parties from seeking appellate reconsideration of an already decided issue in the same case absent some significant change in circumstances'"].) In any event even if we were not bound by the evidentiary analysis in *Zamarron I*, we would reach the same conclusion.

The facts here are compelling. After Zamarron's unidentified companion shot the victim twice, he dropped the gun, regained it, and shot him again. All the while Zamarron made no effort to help the victim. Nor did Zamarron appear to be afraid of the shooter. He did not run away when he had the chance, even though he lived only a block away. Instead, Zamarron

10

got back into the assailant's car and the prosecution's evidence indicates the two of them fled together.

These circumstances strongly suggest that Zamarron was not an innocent bystander in this attempted murder. "Direct evidence of intent to kill is rare, and ordinarily the intent to kill must be inferred from the statements and actions of the defendant and the circumstances surrounding the crime." (*People v. Canizales* (2019) 7 Cal.5th 591, 602.) We conclude the evidence presented was sufficient to support the trial court's finding that Zamarron aided and abetted the attempted murder.

We also reject Zamarron's contention that the trial court's statement that it had not considered gang evidence necessarily precluded the prosecution from establishing beyond a reasonable doubt that he had aided and abetted the commission of the attempted murder. Zamarron highlights the fact that at various points in the proceedings the prosecutor emphasized his gang affiliation was key to understanding why Zamarron would have agreed to participate in this attempted murder. He also notes that this court, in *Zamarron I*, stated that "[a]dmission of the gang evidence was essential to an understanding of *why* the shooting took place and *why* Zamarron would have been involved." (*Zamarron I*, *supra*, G022566, italics added.)

Establishing the defendant's motive for participating in a crime can be helpful to the prosecution; thus, any evidence that tends to prove motive is relevant. But the prosecution is generally not required to prove motive. (*People v. Hillhouse* (2002) 27 Cal.4th 469, 503-504 ["although malice and certain intents and purposes are elements of the crimes, as the court correctly instructed the jury, *motive* is not an element"].) These comments therefore are not dispositive. In fact, we give them little weight in our analysis of the evidence.

11

## III.

### COURT'S CONSIDERATION OF AGE AND TRAUMA

At the hearing, Zamarron testified about his adolescent drug use and trauma, and presented expert testimony to explain how the adolescent brain processes information and risk, and how past trauma can affect development. Zamarron's youth was emphasized by counsel in arguing that he did not form the intent to murder. The court did not specifically address these issues in its ruling. Zamarron therefore relies on *People v. Pittman* (2023) 96 Cal.App.5th 400 (*Pittman*), for the proposition that the court's failure to specifically address the issue demonstrates it did not consider the issue in deciding the petition.

We are not persuaded. The general rule is that we presume the court understood the law and applied it correctly. (*People v. Stowell* (2003) 31 Cal.4th 1107, 1114, ["we apply the general rule 'that a trial court is presumed to have been aware of and followed the applicable law'"].)

While *Pittman* departed from that rule, it is inapposite because in *Pittman* the appellate court's decision to remand the case was based on three factors not present here: (1) the issue had not been raised by the defendant before the trial court; (2) the law requiring the court to consider youth as a factor was so new that ""it is unlikely . . . that the trial court [or the parties] could have known to consider [Pittman's] age and maturity level, particularly to the extent now required by cases issued after [the resentencing] hearing'""; and (3) the court "did not mention the subject in its otherwise comprehensive ruling." (*Pittman, supra*, 96 Cal.App.5th at pp. 416-417.) Based on those factors, the *Pittman* court concluded: "We cannot, therefore, assume the trial court implicitly considered it." (*Id.* at p. 417.)

We find none of those factors present here. Zamarron's youth at the time of his crime was squarely presented and well-developed at the hearing; the law requiring the court to consider the defendant's relative youth in deciding a resentencing petition was no longer new by the time the court made its ruling; and the court did not issue a ruling that detailed its thinking on every issue *except* that one. We therefore presume the court applied the law correctly.

## DISPOSITION

The postjudgment order is affirmed. In the ordinary course, this decision will be final 30 days after the opinion is filed. (Cal. Rules of Court, rule 8.366(b)(1).) The clerk of this court would ordinarily issue the remittitur after the time expires for the Supreme Court to grant review. (Cal. Rules of Court, rule 8.272(b).) This court can grant early finality and direct immediate issuance of the remittitur only upon stipulation of the parties. (Cal. Rules of Court, rule 8.272(c)(1).)

GOETHALS, ACTING P. J.

WE CONCUR:

SANCHEZ, J.

DELANEY, J.

13