Filed 3/13/26  G.D. v. J.D. CA2/7

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| G.D.,<br><br>      Respondent,<br><br>      v.<br><br>J.D.,<br><br>      Appellant. | B333973<br>(Los Angeles County<br>Super. Ct. No. 20STFL08338) |

APPEAL from an order of the Superior Court of Los Angeles County, Armando Duron, Commissioner.  Affirmed.

The Law Offices of Anthony Ukran and Anthony Ukran for Appellant.

Leichter Leichter-Maroko and Ariel Leichter-Maroko for Respondent.

_____

J.D. appeals from a domestic violence restraining order (DVRO) protecting her ex-husband, G.D., issued under the Domestic Violence Prevention Act (DVPA) (Fam. Code, § 6200 et seq.).[1]  She argues that substantial evidence does not support the trial court's findings that she harassed G.D. and disturbed his peace.  We find no error and affirm.

### FACTUAL AND PROCEDURAL BACKGROUND

A.   *G.D.'s Request for a Restraining Order*

In March 2023 G.D. requested a domestic violence restraining order against J.D. based on her "*repeatedly* volatile, harassing, and threatening behavior."  He alleged J.D. had emotionally and mentally abused him, made false accusations about him and his family, and yelled at and intimidated him in front of their then-13-year-old daughter, C.D.  The court issued a temporary restraining order and set a hearing date.

B.   *The Hearing and the Restraining Order*

The court held a three-day hearing in May and June 2023.  G.D. testified and also called his sister J.S. as a witness in support of the restraining order.  In defense J.D. testified and also called an employee of the family's temple to testify.

1.   *The restaurant incident in June 2022*

G.D. testified that in June 2022 J.D. confronted him and

_____

[1]   Statutory references are to the Family Code.  We refer to the adult protected party by his initials.  (See Cal. Rules of Court, rule 8.90(b)(1) [names of "protected persons in domestic violence-prevention proceedings" may be abbreviated to protect their privacy interests].)  We also refer to J.D. and the parties' family members by their initials for the privacy of the protected party.

2

his girlfriend at a restaurant.  J.D. asked whether G.D. would be sitting with "that man," referring to his girlfriend.  He felt upset after J.D. made that comment.  She later reentered the restaurant and took photos of G.D. and his girlfriend without permission, then told G.D. he should be embarrassed and ashamed of himself.

In her testimony, J.D. denied asking G.D. if he was dining with a man.  She testified that she took a photo of G.D. and his girlfriend for two reasons: to show C.D. there was nothing to be afraid of and to identify whether the woman was the same person who had been calling and frightening C.D. via video calls.  She claimed G.D. then escorted her to the door and shoved her out.

2.      *Repeated phone calls*

G.D. stated that between June 2020 and November 2022 J.D. repeatedly called G.D. without his consent and harassed him.  He testified the calls varied in frequency—sometimes a few per day, other times several per month.  G.D. asked J.D. to stop "calling, yelling at me, harassing me, calling me bad names, and causing stress and anxiety in me."  He said he felt "very uncomfortable and stressed" when J.D. would yell at him on the phone, and it made it difficult for him to focus on his work as an obstetrician/gynecologist.

G.D. testified that on one particular day in November 2022 J.D. called his workplace more than five times over several minutes.  She wanted to discuss G.D. paying for their daughter's bat mitzvah scheduled seven months later.  During the call, J.D. told G.D. "after C.D.'s ba[t] mitzvah you can marry the transgender that you are with"—a comment that bothered G.D., as his girlfriend was not transgender.  She also threatened to disclose to G.D.'s family that he had a daughter from a previous

3

relationship. G.D. said J.D.'s threat made him "very uncomfortable," and he blocked J.D.'s number afterward. He repeatedly requested J.D. contact him only through a co-parenting internet application, OurFamilyWizard.

G.D. indicated that in February 2023 J.D. called him from an unknown number. J.D. yelled at G.D. and threatened to take away his custody of C.D. G.D. had the call on speakerphone, and C.D. heard the threat. J.D. also accused G.D. of hiding money with J.S. and claimed J.S. had stolen from J.D. C.D. was visibly upset.

In J.D.'s testimony, she described instances of seemingly peaceful and consensual communication post-separation. She said that between June 2020 and November 2022 G.D. initiated phone calls and texts, and he invited her to events, including C.D.'s birthday party. J.D. estimated both parties had called each other 10 to 15 times during the relevant period, and she denied yelling, insulting, or being abusive during those calls. Emails G.D. had sent her in late 2022 were introduced into evidence. J.D. denied ever referring to G.D.'s girlfriend as transgender or a man or threatening to reveal G.D.'s other child to his family. She also denied that G.D. had ever asked her to use only OurFamilyWizard for communication.

With respect to her February 2023 call from another phone number, J.D. testified that she called G.D. because C.D. was supposed to be home half an hour earlier and J.D. was worried. She said G.D. did not answer her call from her regular number, and because he often failed to check OurFamilyWizard messages promptly, she called from another number. She denied threatening to take away his custody of C.D. or accusing G.D. of hiding money.

4

3.      *Incidents at temple in February and March 2023*

J.S. testified that she and her husband attended C.D.'s bat mitzvah practice in February and March 2023 along with G.D. because G.D. did not want to be alone with J.D.  G.D. and J.S. both testified that during the February practice, J.D. approached G.D. and J.S. and directed offensive Persian curses at them, stating "I spit on your honor" and "Death on your head," as translated from Farsi.

J.S. testified that before the March 2023 practice, J.D. again threatened her, saying, "I will pull the money out of your throat."  J.D. also approached J.S. with temple security and falsely claimed J.S. had pushed her.  G.D. testified that after the meeting that day, J.D. started to approach him, and G.D. went into a room where others were playing chess so he would not be alone with her.  He waited in the restroom to avoid further interaction.  He then asked a security guard to escort him to his car, explaining he feared "that she may come close to [him] and accuse [him] of hitting her or hurting her or making false accusations."[2]  When G.D. got to the parking garage, J.D. was standing next to her car, which was parked a few cars away from G.D.'s.  G.D. subsequently hired a bodyguard to accompany him to C.D.'s bat mitzvah because he feared J.D. might approach him there.

J.D. denied making insulting comments to G.D. or his family at temple in February or March 2023.  She claimed that on the March 2023 date J.S. and her husband were aggressive toward her and J.S.'s husband had pushed J.D.'s arm, which

---

[2]      G.D. testified that in 2019, after C.D. stepped on J.D.'s foot and a doctor found "she had a crack in her foot," J.D. falsely accused G.D. of breaking her foot.

5

made her frightened. She denied seeing G.D. in the hallway or near her car that day. A temple employee called by J.D. testified that on that day J.D. approached him for help, claiming she was being harassed. He witnessed J.D. arguing with a man (presumably J.S.'s husband), who "kept kind of coming toward her." The employee described the man as argumentative and aggressive, and said J.D. appeared scared. The employee did not know G.D.

4. *Impact of J.D.'s behavior on G.D.*

G.D. testified he was seeking a restraining order because he was "worried that [J.D.] may falsely accuse [him] of doing things that [he had] not done," harass him, "cause a stress in" him, and "continue to ruin [his] career and [his] life." The stress from the unwanted communication with J.D. affected his ability to work and caused ongoing anxiety. He felt especially uncomfortable when J.D. yelled at him in front of their daughter. Messages between the parties showed G.D. asking J.D. to stop "falsely accusing me" and stating: "I don't want to receive your abusive phone calls, and that is why I blocked your number." G.D. had not returned to retrieve personal belongings from their former shared home since moving out in June 2020 because he feared prompting J.D. to falsely accuse him of abuse.

5. *The court's ruling*

On June 21, 2023 the court issued a two-year DVRO protecting G.D. The order barred J.D. from contacting G.D., except for peaceful exchanges of C.D. and through OurFamilyWizard. The court found that although each individual incident might not, on its own, meet the definition of domestic abuse, "in the aggregate . . . the cumulative effect of these incidents . . . does constitute domestic violence of the

6

nature of disturbing the peace and harassing of" G.D. The court found G.D.'s testimony credible "with respect to . . . almost all the issues," including his claim that J.D. "falsely accused him of having run her over." The court also concluded the fact "that there is evidence of peaceful contact on other occasions does not mean that all exchanges were civil and not abusive." The court found not credible J.D.'s explanation for photographing G.D. and his girlfriend at the restaurant and her claim that she feared G.D. during that interaction.

J.D. timely appealed the restraining order.

## DISCUSSION

A. *J.D.'s Appeal Is Not Moot Despite the Expiration of the Restraining Order*

The DVRO expired in June 2025, and G.D. did not seek a renewal. G.D. argues the appeal is moot because the restraining order was not renewed.

" 'A case becomes moot when events " 'render[ ] it impossible for [a] court, if it should decide the case in favor of plaintiff, to grant him any effect[ive] relief.' " ' " (*In re S.R.* (2025) 18 Cal.5th 1042; see *In re Marriage of A.M. & R.Y.* (2025) 110 Cal.App.5th 1115, 1124.) " 'It is well settled that an appellate court will decide only actual controversies and that a live appeal may be rendered moot by events occurring after the notice of appeal was filed.' " (*Building a Better Redondo, Inc. v. City of Redondo Beach* (2012) 203 Cal.App.4th 852, 866.) " 'If relief granted by the trial court is temporal, and if the relief granted expires before an appeal can be heard, then an appeal by the adverse party is moot.' " (*City of Monterey v. Carrnshimba* (2013) 215 Cal.App.4th 1068, 1079.)

7

However, an appeal from an expired restraining order "is not moot . . . if it 'could have consequences for [a party] in . . . future court proceedings,' " including custody proceedings. (*Cardona v. Soto* (2024) 105 Cal.App.5th 141, 148; see *San Diego Police Dept. v. Geoffrey S.* (2022) 86 Cal.App.5th 550, 564 ["An appeal from an expired restraining order is not moot if it could have collateral consequences in future proceedings."].)  Here, the DVRO could have implications for J.D. in future family court proceedings relating to child custody and spousal support.  Under section 3044, a finding of domestic violence by a parent triggers a rebuttable presumption against awarding custody of a child to that parent—a presumption that lasts five years regardless of a restraining order's expiration.  (§ 3044, subd. (a); *Cardona*, at p. 148.)  " ' "Because a DVPA restraining order must be based on a finding that the party being restrained committed one or more acts of domestic abuse, a finding of domestic abuse sufficient to support a DVPA restraining order necessarily triggers the presumption in section 3044." ' "  (*Cardona*, at p. 148.)  The issuance of the DVRO would therefore have the potential to affect J.D.'s custody rights even after the DVRO has expired.  (See *ibid.* [appeal from DVRO not moot because section 3044 presumption would endure even after the DVRO expired].)  In addition, when ordering spousal support, the family court must consider whether the court has "[i]ssu[ed] a protective order after a hearing pursuant to Section 6340."  (§ 4320, subd. (i)(1)(4).)  Thus, although the restraining order is expired, this appeal is not moot.

B.    *Governing Law and Standard of Review*
The DVPA authorizes the trial court to issue a protective order "to restrain any person for the purpose of preventing a

8

recurrence of domestic violence and ensuring a period of separation of the persons involved" upon "reasonable proof of a past act or acts of abuse." (§ 6300.) "The DVPA's definition of abuse includes, among other things, '[t]o engage in any behavior that has been or could be enjoined pursuant to Section 6320.' (§ 6203, subd. (a)(4)), and specifies that the definition of abuse 'is not limited to the actual infliction of physical injury or assault.' (§ 6203, subd. (b).) Behavior that may be enjoined pursuant to section 6320 includes 'stalking, threatening . . . , *harassing,* telephoning, including, but not limited to, mareking annoying telephone calls as described in Section 653m of the Penal Code, destroying personal property, *contacting, either directly or indirectly, by mail or otherwise,* coming within a specified distance of, or *disturbing the peace of the other party*.' " (*Sabato v. Brooks* (2015) 242 Cal.App.4th 715, 723, citing § 6320, subd. (a).) "Disturbing the peace" is "conduct that, based on the totality of the circumstances, destroys the mental or emotional calm of the other party. This conduct may be committed directly or indirectly, . . . and by any method or through any means including, but not limited to, telephone, online accounts, text messages, internet-connected devices, or other electronic technologies." (§ 6320, subd. (c).)

A restraining order may issue upon proof of past abuse by a preponderance of the evidence. (*In re Marriage of Davila & Mejia* (2018) 29 Cal.App.5th 220, 226; *Cooper v. Bettinger* (2015) 242 Cal.App.4th 77, 90, fn. 14.) The court must evaluate "the totality of the circumstances" in determining whether to grant or deny a domestic violence restraining order. (§ 6301, subd. (d).)

We review the trial court's decision to grant a DVRO for abuse of discretion. (*R.R. v. C.R.* (2026) 117 Cal.App.5th 1262,

1272.)  We review factual findings for substantial evidence, considering the record in the light most favorable to the judgment and drawing all reasonable inferences in support of the judgment.  (*Ibid*.; *Melissa G. v. Raymond M.* (2018) 27 Cal.App.5th 360, 373-374.)  "[C]redibility determinations . . . are subject to 'extremely deferential review' [citation], and ' "[a] trier of fact is free to disbelieve a witness . . . if there is any rational ground for doing so." ' "  (*Vinson v. Kinsey* (2023) 93 Cal.App.5th 1166, 1176.)

C.    *Substantial Evidence Supports the Court's Determination that J.D. Harassed G.D. and Disturbed His Peace*

J.D.'s core argument is that her actions were too minor or sporadic to constitute abuse.  These arguments are unavailing.  Substantial evidence supports the court's finding that she harassed G.D. and disturbed his peace.

The evidence of J.D.'s repeated, unwanted phone calls supported the court's findings.  G.D. testified that between June 2020 and November 2022 he repeatedly asked J.D. to stop calling his cell phone because she would insult and yell at him, causing him stress and anxiety.  But J.D. continued calling, including in November 2022, when she called G.D. at work more than five times within a few minutes, even after he told her he could not talk.  During that call, J.D. insulted and threatened G.D., falsely referred to his girlfriend as a transgender woman, and threatened to reveal to G.D.'s family that he had a child from another relationship.  On another occasion, after G.D. blocked her number and asked her to contact him only through OurFamilyWizard, J.D. called him from another line and threatened to take custody of C.D.  The court was entitled to, and

10

did, credit G.D.'s testimony.  (See *In re Marriage of Evilsizor & Sweeney* (2015) 237 Cal.App.4th 1416, 1426-1427 ["the trial court was in the best position to evaluate credibility and to resolve factual disputes, and our review of the record reveals sufficient evidence to conclude that the court's order was not an abuse of discretion"].)  Substantial evidence thus supports the trial court's determination that J.D.'s repeated and aggressive phone calls constituted harassment and disturbed his peace.  (See *N.T. v. H.T.* (2019) 34 Cal.App.5th 595, 603 [substantial evidence of harassment through repeated unwanted contact]; *Burquet v. Brumbaugh* (2014) 223 Cal.App.4th 1140, 1144 [affirming a finding of disturbance of the peace through persistent communication despite repeated requests to stop]; *Nevarez v. Tonna* (2014) 227 Cal.App.4th 774, 783-784 [rejecting argument that repeated contact was "mere badgering"].)  J.D.'s threats to reveal G.D.'s child born out of wedlock and to take away his custody of C.D. provided additional justification for issuing the DVRO.  (See *In re Marriage of Reichental* (2021) 73 Cal.App.5th 396 [upholding restraining order where the wife threatened to reveal negative information about husband to destroy his reputation]; *In re Marriage of Nadkarni* (2009) 173 Cal.App.4th 1483, 1498 (*Nadkarni*) [finding substantial evidence of abuse based on former husband disclosing confidential emails to third parties and using the emails to "control, harass, and abuse" ex-wife].)

J.D. claims there was no substantial evidence of harassment based on the phone calls because she called G.D. only 10 to 15 times—a number she says was uncontroverted.  But the trial court was not required to accept J.D.'s version of events.  (See *Schmidt v. Superior Court* (2020) 44 Cal.App.5th 570, 582

11

["The trial judge may believe or disbelieve uncontradicted witnesses if there is any rational ground for doing so."].)  In any event, there is no minimum number of unwanted communications in order to find harassment or disturbance of the peace.

J.D. also defends the episode of repeated workplace calls and the later call from another number by arguing she needed to communicate about their daughter.  J.D. asserts the trial court committed error when it stated during the hearing that "the legitimacy of why [J.D.] was calling is not the point here," and "just because you are legitimately calling about something doesn't mean you get to do it and it doesn't mean you get to do it in the way you want to do it, which is what he's complaining about."  J.D. argues the trial court ignored the principle that "simply doing something in a way that the other person does not like, is not domestic violence."  But the import of the court's ruling was that no matter what the intended purpose of J.D.'s call was, the manner of the call was harassing to G.D.  Although the "DVPA was not enacted to address all disputes between former couples," and a restraining order need not "issue based on any act that upsets the petitioning party" (*Curcio v. Pels* (2020) 47 Cal.App.5th 1, 13), the trial court found the calls were harassing and disturbed G.D.'s peace.  (See *Parris J. v. Christopher U.* (2023) 96 Cal.App.5th 108, 121 ["disturbing the peace" under section 6320 is measured not by a reasonable person standard, but by a subjective standard]; *K.L. v. R.H.* (2021) 70 Cal.App.5th 965, 981 ["What disturbs the peace of a person differs in each case."].)

Other incidents also support the court's finding that J.D. harassed G.D. and disturbed his peace.  The court credited G.D.'s

testimony that J.D. publicly harassed him at a restaurant by taking unauthorized photographs of him and his girlfriend, misgendering his girlfriend, and telling G.D. to feel "ashamed" and "embarrassed" of himself. J.D. also made false and inflammatory accusations, including that G.D. broke her foot[3] and hid money with J.S. At temple, J.D. directed offensive Farsi insults at G.D. and J.S. She also appeared to wait for G.D. in a parking garage and left only when she saw he was accompanied by a security guard.

Substantial evidence showed these actions disturbed G.D.'s peace by destroying his mental and emotional calm. (§ 6320, subd. (c).) He testified that J.D.'s behavior left him "very uncomfortable and stressed," interfered with his ability to care for patients, and caused him ongoing anxiety. G.D.'s distress was evident not just through his testimony, but also through his actions. He took protective steps (including hiring a bodyguard for C.D.'s bat mitzvah) and had not retrieved his personal belongings from the former family home to avoid false allegations of abuse. As G.D. explained, he sought a restraining order because he was "worried that she may falsely accuse [him] of doing things that [he had] not done," harass him, "cause a stress in" him, and "continue to ruin [his] career and [his] life." This evidence supports the court's finding that J.D.'s conduct met the statutory definition of disturbing the peace. (§ 6320, subd. (c); see *Nadkarni, supra*, 173 Cal.App.4th at p. 1499 [substantial

---

[3]  J.D. argues the court erred by stating she falsely accused G.D. of "having run her over," when the allegation was that she accused him of breaking her foot. This was a minor misstatement with no bearing on the soundness of the court's reasoning.

13

evidence supported finding where conduct caused " 'shock' and 'embarrassment,' " and fear for safety and professional relationships].)

J.D. also attempts to isolate each alleged incident, asserting that she only called G.D. multiple times on one day, made insulting remarks years earlier, took photos only once, and allegedly made a false accusation only once. She argues that because these events each occurred only once, they do not constitute a pattern of harassment. But the law does not support analyzing a party's conduct in this piecemeal way. The question is whether the cumulative effect of a pattern of harassing behavior—regardless of whether it took different forms—destroyed G.D.'s peace of mind. (See *McCord v. Smith* (2020) 51 Cal.App.5th 358, 366 ["Whether one single act . . . would have been sufficient to justify the issuance of the [domestic violence restraining order] is not the question—the trial court considers whether the totality of the circumstances supports the issuance of the [restraining order]."].) As discussed, it was reasonable for the court to conclude J.D. repeatedly harassed and disturbed the peace of G.D. through a variety of different types of conduct and communication channels.

J.D. also compares her actions to more extreme behavior in other cases, arguing that her conduct was less egregious. But the standard is not whether J.D.'s behavior was *worse* than that in other cases, but whether the court abused its discretion in finding that her conduct met the statutory definition of abuse. The court did not. Nor is J.D. correct that abuse must fall into one of two categories: where "one of the parties refuses to accept the break-up of the relationship," or where "the offending party engages in a clear pattern of behavior attempting to control the other party

14

against their will."  The DVPA defines abuse broadly, and the court properly found that definition was met based on the particular circumstances here.  (See *Nadkarni*, *supra*, 173 Cal.App.4th at p. 1498 ["the Legislature intended that the DVPA be broadly construed in order to accomplish the purpose of the DVPA," and trial courts are " 'entrusted with authority to issue necessary orders suited to individual circumstances"].)[4]

Finally, J.D. contends that even if abuse occurred, it was unlikely to recur.  But a domestic violence restraining order does not require proof of likely future abuse.  (See *R.R. v. C.R.*, *supra*, 117 Cal.App.5th at p. 1275 [petitioner was not required "to establish a probability of future abuse, as section 6300 permits the court to issue a DVRO upon 'reasonable proof of a past act or acts of abuse' "]; *Nevarez v. Tonna*, *supra*, 227 Cal.App.4th at p. 783 ["trial court was not required to find a probability that Tonna would commit future abuse before issuing a restraining order under section 6300"].)

/ / /

/ / /

---

[4]	J.D. also contends the court improperly excluded evidence about whether G.D. was ever physically abusive during their marriage and whether he had ever grabbed C.D. and dragged her to her room.  However, the court reasonably limited its focus to J.D.'s conduct and whether it met the DVPA standard for abuse.

15

## DISPOSITION

The restraining order is affirmed.  G.D. shall recover his costs on appeal.

                              STONE, J.

We concur:


          SEGAL, Acting P. J.


          GIZA, J.*

---

\*      Judge of the Los Angeles County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.